UNITED STATES of America, Appellee,

v.

Joseph Leon ARCHIE, Appellant.

No. 80–2105.

United States Court of Appeals, Eighth Circuit.

Submitted May 22, 1981.

Decided Aug. 19, 1981.

Douglas A. Kelley, Asst. U. S. Atty. (argued), Thomas K. Berg, U. S. Atty., Janice M. Symchych, Asst. U. S. Atty., D. Minn., Minneapolis, Minn., Dennis Brown, Legal Intern, for appellee.

Daniel M. Scott F. P. (argued), Scott F. Tilsen, Asst. Federal Defender, D. Minn., Minneapolis, Minn., for appellant.

Before HEANEY and BRIGHT, Circuit Judges, and HARRIS,\* Senior District Judge.

OREN HARRIS, Senior District Judge.

Joseph Leon Archie was convicted by a jury in the United States District Court for the District of Minnesota [1] of violating 18 U.S.C. §§ 2 and 2113(a) and (d) on September 26, 1980. Specifically, Archie was convicted of aiding and abetting in the robbery of the Arcade Avenue Branch of Midwest Federal Savings and Loan, St. Paul, Minnesota. This appeal challenges the conviction.

On July 21, 1980, at approximately 1:45 p.m., three masked, black men entered the rear door of the Arcade Avenue Branch of Midwest Federal Savings and Loan. Two of the men were carrying handguns. As the robbers entered, a bank employee activated the security camera.

One robber, wearing a cream-colored jumpsuit, pink Playtex gloves, and a tan ski mask, jumped over the teller counter. A second robber, wearing a dark jumpsuit, white painter's gloves, and a maroon ski mask, stood on the customer side of the teller counter and aimed a gun at Kelly Gimple and Tammy Klinkhammer, the two tellers on duty. The third robber, wearing a dark-colored jumpsuit and a maroon ski mask, stationed himself at the new accounts desk and held a gun to the neck of Ruth Ann Kruger, an employee.

The first robber stuffed money from the cash drawers into a white canvas bag while the other two held guns on the three employees. While taking the money from the drawers, the first robber activated the burglar alarm. The St. Paul Police Department was immediately notified.

The robbers fled through the back door of the Savings and Loan. The teller, Tammy Klinkhammer, saw a silver car traveling toward the back entrance of the bank. She observed the robbers get into the car and noted the license number to be BVM–667. She was not able to discern the number of people in the car. Ruth Kruger also noted the license number as BVM–667. The getaway car turned left onto Arcade Street.

Less than a mile from the Savings and Loan, sixteen-year old Jeffrey Cortez had a near collision with the silver car. The driver of the silver car, which was approaching the rear of the Cortez automobile, had to slam on the brakes to avoid a collision. Cortez, looking in his rear-view mirror, saw four black men in the car. The driver, according to Cortez, was older than the other men, and wore a white T-shirt and black gloves. Cortez, angry about the near collision, followed the car. He observed a marked police car make a U-turn to follow the silver car.

This marked police car was driven by Officer Brooke Schaub. He had been one and one/half miles from the Savings and

---

1. The Honorable Harry H. MacLaughlin presiding.

Loan when he heard a radio dispatch at 1:53 p.m. alerting officers to the robbery. While heading east, enroute to the Savings and Loan, he heard a description of the getaway car. Shortly thereafter, he observed a silver sedan with the license number BVM–667, occupied by several black males, proceeding west. Schaub made a U-turn, radioed for assistance and followed the silver car into the parking lot of the Chalet Village Apartments. During this time, Officer Schaub had his red lights on. As he pulled into the parking lot, Schaub observed three of the suspects running from the vicinity of the silver car to a row of garages. One suspect was bare-chested, wearing red pants; one was bare-chested and wore blue jeans; and one was fully dressed in dark clothing. The suspects headed toward heavy brush and foliage located west of the garages, and Officer Schaub pursued them on foot. The area just west of the garages was covered with dense underbrush and contained several gulleys and rocks.

Jeffrey Cortez pulled into the parking lot in time to see the last two suspects leave the area of the silver car and begin to run from the police. All four car doors were open. Cortez observed one man run west behind the garage area. The other man crouched behind parked cars to escape detection, then headed east into the apartment building.

Michael Farrell, a tenant of a second floor apartment across the street from Chalet Village, observed the silver car and the police car drive into the parking lot. From his bedroom window, he observed four black men running in single file between the garages. When the men entered the field, Farrell saw them fan out across the field. One of the men, who appeared to be carrying something white in his hands, fell down and was separated from the others. Farrell believed this man was wearing a brown shirt and brown pants. Upon recovering from the fall, the man entered a heavily wooded area just behind the garages.

Officer Schaub, while pursuing the suspects, heard a rustling noise in the underbrush. When he ordered whoever was there to come out, the rustling ceased. Schaub was unable to locate any suspects.

Within minutes after Schaub's arrival at the apartment parking lot, other squad cars appeared. The area was cordoned with officers who prevented bystanders from entering the field. Within fifteen minutes twenty officers were at the scene. Ski masks were found in the area.

Approximately forty-five minutes after the alarm sounded Officer Gerald J. Hernden discovered the appellant, Joseph Leon Archie, hiding in underbrush immediately west of the garages, some five feet from the parking lot. Archie was lying on his stomach in heavy underbrush with only his feet and lower legs visible. Upon seeing the legs, Officer Hernden clicked back the safety catch on his gun. The appellant then stated: "You've got me. I give up. Don't shoot me." Archie, who was wearing brown pants and a brown shirt, was placed under arrest. A search of Archie revealed his name and the fact that he had a rental agreement for a brown, 1975 Cadillac. Suspected contraband was also found in Archie's sock. The rented Cadillac was found four blocks from the parking lot.

The man Cortez observed heading east into the apartment building was later identified as Anthony Webb. Marvin Smith also saw this man enter the apartment building. Webb went to the apartment of Smith's brother where he changed clothes. Smith heard Webb say he had just committed a bank robbery. Later, Smith and two friends went into the field. They found a black man dressed in a blue jumpsuit. This man removed the jumpsuit and walked with them to the parking lot. Smith heard this man say he had been involved in a bank robbery. This man got into a gold Thunderbird and drove away. Smith later recognized this man from a photograph as Joe Seifus.

Webb related the facts of the July 21 robbery to an undercover F.B.I. agent. This occurred during a conspiracy to com-

mit another bank robbery. Webb testified for the government in exchange for a four-year limitation on his sentence for the July 21 robbery, and a promise not to prosecute on the later conspiracy charge. Webb identified Joseph Leon Archie as the driver of the getaway car. Joe Seifus and Allen Todd were named as the other participants.

Archie argues two points for reversal.

## I.

Appellant first challenges the sufficiency of the evidence to support the jury's verdict. Archie argues the trial court erred in not granting his motion for judgment of acquittal.

 This court articulated the standard of review as to the sufficiency of evidence in *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir. 1979):

First, the Court must view the evidence in the light most favorable to the verdict rendered. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, [86 L.Ed. 680] (1942). Second, the Court must accept all reasonable inferences from the evidence which tend to support the jury verdict. *United States v. Overshon*, 494 F.2d 894 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96 [42 L.Ed.2d 85] (1974). Third, the evidence need not exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty. *United States v. Shahane*, 517 F.2d 1173 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191 [46 L.Ed.2d 124] (1975). Fourth, circumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence. *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127 [99 L.Ed. 150] (1954), *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976).

As indicated by its verdict, the jury was convinced beyond a reasonable doubt that the defendant was a participant in the July 21, 1980, robbery of the Arcade Branch of the Midwest Federal Savings and Loan. After a careful review of the record, this court concludes there is substantial evidence to support the conviction.

There is no dispute in the evidence that the three robbers left the bank and entered a silver car, license number BVM–667, which was moving towards them. This same car was pursued by the police into the parking lot of the Chalet Village Apartments. The defendant, some 45 minutes after the area was sealed, was found hiding in the underbrush. His immediate comment to Officer Hernden was: "You've got me. I give up. Don't shoot me."

The testimony of Anthony Webb also supports the conviction. Webb testified as to the events of the robbery, from buying the disguises, to stealing the silver car, to leaving Archie's Cadillac near the apartments, to entering the bank. He testified that the appellant, Joseph Leon Archie, helped plan the robbery and was the driver of the getaway car. Archie contends there is no independent evidence to corroborate this testimony. Even if his testimony was uncorroborated, it could, however, support a criminal conviction. *U. S. v. Taylor*, supra; *United States v. Haskins*, 536 F.2d 775 (8th Cir.), *cert. denied*, 429 U.S. 898, 97 S.Ct. 263, 50 L.Ed.2d 182 (1976).

The jury was given the following instruction with regard to accomplice testimony:

An accomplice is one who unites with another person in the commission of a crime, voluntarily and with common intent. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony of one who asserts by his testimony that he is an accomplice may be received in evidence and considered by the jury, even though not corroborated by other evidence, and may be given such weight as the jury feels it should have. The jury, however, should keep in mind that such testimony is always to be received with caution and considered with great care.

You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe the unsupported testimony beyond a reasonable doubt.

The jury was properly and thoroughly instructed as to the care and caution with which to view accomplice testimony.

Furthermore, the jury was instructed that although a witness who testifies pursuant to a plea agreement is a competent witness, his testimony should be examined with greater care than other witnesses. The Court instructed the jury to consider whether his testimony was colored in a way to further his own interests.

Ultimately, this issue is one of credibility. The jury was properly instructed as to the consideration to give the testimony of an accomplice and one testifying pursuant to a plea agreement. The jury, as evidence by its verdict, believed Anthony Webb's testimony was credible. Credibility and resolution of conflicts in the testimony are issues for the jury to determine.

## II.

Appellant argues he was deprived of a fair trial and the presumption of innocence accorded to all defendants by the Constitution. In this contention, Archie relates several incidents which, when considered in combination, he asserts violated his right to a fair trial.

### A.

■ Archie was in custody from July 21, 1980, until his trial. Bail was set at $35,000.00, cash or surety. Reduction of this amount was requested and denied. Archie contends the bail was excessive. The trial court has the discretion to set bail at an amount which will insure the defendant's presence at trial. In this case, Archie, at the age of 44, had spent 17 years in various prisons. At the time of the robbery, he was on parole for possession of stolen mail. There was a warrant outstanding for his arrest for a violation of this parole. The F.B.I. history on Archie stated he had previous convictions for forgery, armed robbery, and burglary. When arrested, he possessed a suspected narcotic. Archie faced a possible 25 year sentence on the bank robbery, the remainder of his sentence on the stolen mail charge, and a narcotics charge. We cannot say the trial court abused its discretion in setting $35,000.00 as the bail figure.

### B.

■ Archie states that the jury saw him in the custody of the U. S. Marshals. He believes this impressed upon the jury that he was dangerous and, thereby, prejudiced him. After the morning recess on the second day of trial, the jurors were seated in the jury box when Archie entered the courtroom through the door which leads from the U. S. Marshal lock-up. He was accompanied by two marshals.

The appellant immediately moved for a mistrial, which was denied. This court does not find any prejudice in this incident. Archie was not in handcuffs. The marshals were in street attire. The burden is upon appellant to show any prejudice, *Gregory v. United States*, 365 F.2d 203 (8th Cir.), *cert. denied*, 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676 (1967), which he has failed to do.

### C.

■ Archie next contends the jury was prejudiced and unduly inflamed by questions concerning the use of weapons during the robbery. A review of the record does not show an undue emphasis on the handgun issue.

Archie was charged with aiding and abetting in a violation of 18 U.S.C. § 2113(a) and (d). Subsection (a) requires that the government prove the use of force, violence or intimidation during the robbery, while subsection (d) requires the additional proof that victims of the robbery were either

assaulted or had their lives put in jeopardy by the use of a dangerous weapon. Under 18 U.S.C. § 2, an aider and abettor is responsible for the crime charged. While his alleged participation was in driving the getaway car, every element of the offense [here the elements of § 2113(a) and (d)] must be proven. The government asked questions necessary to establish the elements of the bank robbery and thus meet its burden of proof.

■ Nor do we find that the trial court prejudiced the appellant by asking questions of the witnesses. The district judge is more than a moderator; he has a responsibility to see that issues are clearly presented. *United States v. Cooper*, 596 F.2d 327 (8th Cir. 1979); *United States v. Nelson*, 570 F.2d 258 (8th Cir. 1978). Furthermore, the trial court instructed the jury it was not to regard his remarks as expressions of his opinion as to the guilt or innocence of the defendant. We find no error in the district court's questioning of the witnesses with regard to the weapons.

### D.

Archie contends he was deprived of a fair trial because a fair and impartial jury was not impaneled. There are two parts to this contention.

The first attack on the jury panel focuses on the number of prospective jurors connected to the banking and law enforcement communities. Of the 28 initial prospective jurors, two had relatives who worked for banks, five had relatives who were police officers, and one was a bank teller. The bank teller was excused by the court. Mr. Kangas, whose brother was in law enforcement, was excused for cause when he indicated he believed police officers were more observant than ordinary people. In addition, six of the 28 panel members had accounts with Midwest Federal Savings and Loan. None of these six were excused by the court. It is Archie's contention that each juror with relatives employed by financial institutions and as law enforcement officials, as well as those having accounts with Midwest Federal, should have been excused for cause.

■ Absent a clear abuse of discretion, juror qualifications will not be interfered with on appeal. *United States v. Brown*, 540 F.2d 364, 379 (8th Cir. 1976). Actual prejudice must be shown. *United States v. Kelton*, 518 F.2d 531 (8th Cir.), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 460, 46 L.Ed.2d 394 (1975).

In *United States v. Young*, 553 F.2d 1132 (8th Cir.), cert. denied 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed. 278 (1977). This court affirmed a trial court's refusal to strike two jurors. One of these was a senior vice president of a local bank, and the other had a daughter who had been robbed and raped. There, as here, there was no demonstration of actual prejudice.

■ Likewise, we see no error in the trial court's refusal to excuse for cause those jurors who were customers of Midwest Federal. *United States v. Panza*, 612 F.2d 432 (9th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980). Each of the potential jurors stated he could be a fair and impartial juror despite his relationships. We do not find any error in the trial court's action.

■ A more serious point raised by the appellant concerns the court's limited questions to the jury panel on attitudes toward racial issues. Counsel for Archie submitted 68 requested voir dire questions. Sixteen of the 68 questions dealt with the jurors' attitudes on racial issues. Some of them were inappropriate, but a number of those requested were relevant to the question in this particular case. It was obvious to the jury panel that the defendant was black. In lieu of the numerous questions requested by counsel for the defendant, the court consolidated the questions which inquired as to the feelings of the jurors on racial attitudes.

The questions asked by the court, directed to the entire panel, were as follows:

Now as you noticed and I noticed, the defendant in this case is black. It would be unconscionable for that fact to have any effect whatsoever one way or the other as to the decision that is reached by the jury in this case. I want you to be completely fair and honest with yourself and with all of us. Do any of you believe that the fact that this defendant is black would make it difficult one way or the other for you to sit as a fair and impartial juror in this case? If so, raise your hand, please.

(None).

Are any of you, or at any time in the past have any of you been members of any group, or organization, or religion or sect, that advocates discrimination based on race or color or sex or creed? Are you now or have you ever been a member of some organization, whether you yourself may have believed it or not, that advocates discrimination based on color, or sex, or race or creed?

(None).

Do any of you have members of your immediate family or particularly close friends who are now members of such a group or have been in the past, to your knowledge?

(None).

In addition, the judge, when individually questioning each prospective juror, asked the following basic question:

Is there any reason that you can think of of any kind why you could not serve as a juror in this case and to be completely fair and impartial and openminded, approach the case without any preconceived notion as to how it should be decided, listen to all the evidence and the law that I give you at the end of the evidence before you make up your mind, and then make up your own mind based only on the evidence that you hear in this courtroom and on the law that I give to you. Is there any reason why you couldn't be that kind of juror?

The appellant contends that the failure of the court to use the questions requested on the issue of race, deprived him of a trial by a fair, unbiased, and impartial jury.

This admittedly volatile question was considered by the Supreme Court of the United States in 1931 in *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, in an opinion by Chief Justice Hughes, with Justice McReynolds dissenting. The court granted a writ of certiorari, limiting the appeal to the question raised by the exception to the ruling of the trial court on the voir dire of prospective jurors.

In *Aldridge* the defendant was a black who was tried for the murder of a white man in the District of Columbia. Outside the hearing of the jury panel, counsel for the defendant raised the question of racial prejudice with the district court. The trial court declined, however, to voir dire the jury on the question.

The court stated that "in asking that the question relative to 'racial prejudice' be put to the jurors, it is only reasonable to assume that counsel referred, not to immaterial matters, but to such a prejudice as would disqualify a juror because precluding an impartial verdict." *Aldridge*, supra, at 311, 51 S.Ct. at 472.

The Supreme Court, under the circumstances presented in the *Aldridge* case, concluded that the ruling of the trial court on the voir dire, summarily disposing of the inquiry, was erroneous and the judgment of the conviction was reversed.

More recently, however, in *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1972), the Supreme Court expanded on its ruling. In *Ham* the trial court had refused to interrogate the veniremen on the issue of racial prejudice. Counsel for the defendant had requested that two general questions dealing with the issue be asked of the panel. They are set forth in a footnote at page 525, as follows:

1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?

2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term "black"?

In lieu of the two questions requested on behalf of the defendant, the trial judge asked the prospective jurors three general questions as to bias, prejudice, or partiality. These questions were specifically required by a South Carolina statute. The Supreme Court held that the Fourteenth Amendment required the trial judge in this case to interrogate the jurors upon the subject of racial prejudice.

> The State having created this statutory framework for the selection of juries, the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the petitioner be permitted to have the jurors interrogated on the issue of racial bias. Cf. *Groppi v. Wisconsin*, 400 U.S. 505, 508 [91 S.Ct. 490, 492, 27 L.Ed.2d 571] (1971); *Bell v. Burson*, 402 U.S. 535, 541 [91 S.Ct. 1586, 1590, 29 L.Ed.2d 90] (1971). *Ham*, supra, at 527, 93 S.Ct. at 850.

The Supreme Court went on to state that:

> We agree with the dissenting justices of the Supreme Court of South Carolina that the trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner . . . . *Ham*, supra, at 527, 93 S.Ct. at 850.

The court further pointed out that in *Aldridge* the rule was established that the trial court "had broad discretion as to the questions to be asked." *Aldridge*, supra, 283 U.S. at 310, 51 S.Ct. at 471. Further, "the discretion as to the form and number of questions permitted by the Due Process Clause of the Fourteenth Amendment is at least as broad." *Ham*, supra, 409 U.S. at 527, 93 S.Ct. at 850.

This court, in *United States v. Bear Runner*, 502 F.2d 908 (8th Cir. 1974), reversed a conviction because the trial judge failed to probe the jury panel as to racial bias. We stated:

> A searching voir dire is a necessary incident to the right to an impartial jury. However, it is fundamental that the trial court has broad discretion in deciding what questions to ask and that its rulings will not be reversed absent an abuse of discretion. The sufficiency of the court's question in this instance, and the propriety of its refusal to probe further, must be judged in the light of all of the attendant circumstances. *Bear Runner*, supra, at 911.

In *Bear Runner*, supra, we took judicial notice of the well publicized events of Wounded Knee. Bear Runner, an American Indian, was tried and convicted in the same locale. We concluded that under the circumstances there existed a sincere concern over prejudicial issues. We held that a general rhetorical question asking if the jurors would be fair and unbiased toward the defendant was of questionable sufficiency. In relying upon the Supreme Court decision in *Ham*, supra, we stated that while general questions were approved, "we view this statement as an expression of the minimum requirement, and not as a limitation on a more extensive inquiry *where the facts warrant it.*" (Emphasis supplied.)

In the instant case, there is no evidence or any indication the trial or the incidents which gave rise to the trial were well-publicized. We do not believe *Ham* and *Bear Runner* requires us to reverse and remand. While the voir dire might have been more extensive and probing with regard to racial attitudes, we do not believe it to be so insufficient as to require reversal.

Although we express our concern in this case with the limited questions on the issue, we think the general questions of the Court on the issue at least satisfied the minimum

requirement to insure the "essential demands of fairness." [2]

The record discloses substantial testimony upon which the jury returned a verdict of guilty. We, therefore, conclude that there is no error on the issues, as contended by the appellant, either singly or in combination. We, therefore, affirm.

2. In *Ham*, supra, 409 U.S. at 527, 93 S.Ct. at 850, the Supreme Court stated that: "In this contest, either of the brief general questions urged by the petitioner would appear sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain."