UNITED STATES of America,
Plaintiff-Appellee,

v.

Manuel W. JAMES, etc. and Gustavo
Fernandez, Defendants-Appellants.

No. 82-5137.

United States Court of Appeals,
Eleventh Circuit.

April 30, 1982.

Ronald A. Dion, North Miami Beach, Fla., for defendants-appellants.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before RONEY, KRAVITCH and CLARK, Circuit Judges.

KRAVITCH, Circuit Judge:

Manuel James and Gustavo Fernandez appeal from the district court's amendment of their conditions for bond under 18 U.S.C. § 3146. Appellants contend that their bonds could not be altered absent proof that they had violated a bond condition, that the policy of the Northern District of Florida against property bonds violates § 3146, that the amended bonds denied them their eighth amendment rights not to be subjected to excessive bail, and that the trial court failed to give adequate reasons for the bond amendment. We reject these contentions and affirm.[1]

---

1. We have jurisdiction over this appeal under 18 U.S.C. § 3147(b). This case was entitled to preference in processing and disposition pursuant to Eleventh Circuit Rule 12.

## I. Background

Both James and Fernandez are long-time residents of Key West, Florida, and have family ties and property there. James is an attorney, and Fernandez has been employed for the past four years by Safe Harbor Boat Repair Company. In September 1981 both men were indicted under the federal drug laws and the Racketeer Influenced and Corrupt Organization Act (RICO) for their involvement in a multi-million dollar marijuana smuggling enterprise which operated from 1977 to 1981.[2] The charges carry a potential for life sentences without parole.[3]

After the indictment was returned, Judge Higby of the Northern District of Florida issued a warrant for appellants' arrests; the warrant stated that bond would be set at $20 million.[4] Both James and Fernandez voluntarily surrendered to federal authorities in the Southern District, and made their initial appearance before a federal magistrate of that district who after a hearing set a $5 million property bond for Fernandez and a $1 million bond consisting of $50,000 corporate surety, $450,000 personal surety and $500,000 property for James. Subsequently, pre-trial proceedings on the charges began in the Northern District, and at a hearing on various pre-trial

motions the government orally requested reinstatement of the $20 million bond.[5] The trial court rejected the government's request, but amended the bonds to require a $2 million cash or corporate surety bond for each appellant. Neither James nor Fernandez were able to post the amended bond, and this appeal followed.

## II. Amendment of Bonds under 18 U.S.C. § 3146

Appellants' first argument is that a district court has no authority to increase a bond unless evidence is presented to show that the defendant has violated or is about to violate a condition of release. We reject this argument. Title 18, United States Code, § 3146(e) states:

> (e) A judicial officer ordering the release of a person on any condition specified in this section may at any time amend his order to impose additional or different conditions of release: *Provided,* That, if the imposition of such additional or different conditions results in the detention of the person as a result of his inability to meet such conditions or in the release of the person on a condition requiring him to return to custody after specified hours, the provisions of subsection (d) shall apply.[6]

---

**2.** Specifically, appellants were indicted for racketeering activity in violation of 18 U.S.C. §§ 2, 1961, 1962(c) & (d), and 1963; conspiracy to possess marijuana with intent to import, conspiracy to possess marijuana with intent to distribute, and conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846, 960, and 963; and a continuing criminal enterprise under 21 U.S.C. § 848.

**3.** 21 U.S.C. § 848.

**4.** Although the warrant stated that bond was set at $20 million, James and Fernandez did not make an initial appearance before Judge Higby for a bond hearing. Rather, the initial appearance and bond hearing was before federal magistrate Patricia Kyle of the Southern District of Florida. Hence we conclude that Magistrate Kyle, not Judge Higby, was the "releasing officer" under § 3146. *See* text *infra.*

**5.** At the time of this request, the court had heard a substantial portion of the evidence against James and Fernandez as a result of their motions to suppress.

**6.** 18 U.S.C. § 3146(d) states:

> (d) A person for whom conditions of release are imposed and who after twenty-four hours from the time of the release hearing continues to be detained as a result of his inability to meet the conditions of release, shall, upon application, be entitled to have the conditions reviewed by the judicial officer who imposed them. Unless the conditions of release are amended and the person is thereupon released, the judicial officer shall set forth in writing the reasons for requiring the conditions imposed. A person who is ordered released on a condition which requires that he return to custody after specified hours shall, upon application, be entitled to a review by the judicial officer who imposed the condition. Unless the requirement is removed and the person is thereupon released on another condition, the judicial officer shall set forth in writing the reasons for continuing the requirement. In the event that the judicial officer who imposed conditions of release is not available, any other judicial officer in the district may review such conditions.

Thus by the express statutory language, the judicial officer who first sets the conditions of release "may at any time amend his order to impose additional or different conditions of release ..." (emphasis added). The "at any time" language indicates that an amendment of conditions of release is not conditioned on any event or evidence of a potential violation of the conditions by the accused.

Appellants nevertheless contend that 18 U.S.C. § 3143 controls the imposition of more onerous bond conditions. This section states:

> When proof is made to any judge of the United States, or other magistrate authorized to commit on criminal charges, that a person previously released on the execution of an appearance bail bond with one or more sureties on any such charge is about to abscond, and that his bail is insufficient, the judge or magistrate shall require such person to give better security, or, for default thereof, cause him to be committed; and an order for his arrest may be indorsed on the former commitment, or a new warrant therefor may be issued, by such judge or magistrate, setting forth the cause thereof.

We, however, do not agree that § 3143 circumscribes the authority of a judicial officer to amend the conditions of release under § 3146(e). The "shall require" language of § 3143 indicates that an increase in bail is *mandatory* upon the proper proof that the defendant is about to abscond. Section 3146, on the other hand, is permissive, and enables, but does not require, amendments to conditions of release at any time and for reasons other than the possibility the accused will abscond. Moreover, it would be illogical to hold that Congress, in stating that a judicial officer may "at any time" impose additional conditions of release, in fact intended for additional conditions to be permitted only upon proof the defendant was about to leave the jurisdiction. We therefore conclude that § 3143 did not bar the trial court's action in this case. *Cf., United States v. Zuccaro*, 645 F.2d 104, 106 (2d Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 110, 70 L.Ed.2d 96 (1981) ("trial judge may amend conditions of bail subject only to the statutory standards applicable to the setting of bail without any prior determination that the magistrate's order was clearly erroneous or contrary to law.").

Although we find that § 3143 does not affect a judicial officer's authority to amend conditions of release under § 3146, the district court's authority to amend appellants' bonds in this case requires further analysis. According to § 3146(e), the authority of that subsection extends to "the judicial officer ordering the release" of the defendant. Here the judicial officer who ordered the release of James and Fernandez was not the district court for the Northern District of Florida, but a magistrate of the Southern District. Thus we are presented with the problem whether the district court having original jurisdiction over the case may amend the conditions of a defendant's release on motion by the government even though that court is not the releasing officer under § 3146(e).[7]

This exact issue was the subject of a recent Second Circuit case, *United States v. Zuccaro*, 645 F.2d 104 (2d Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 110, 70 L.Ed.2d 96 (1981). In *Zuccaro*, the appellant was arrested and brought before a federal magistrate who set bond at $150,000. The following day the district attorney motioned the district court to have bail increased to $500,000. After a hearing, the district judge set bail at $350,000 and Zuccaro appealed, claiming that because the trial judge was not the releasing officer under

---

**7.** Under § 3147(a), the defendant may move the court of original jurisdiction for an amendment of bond conditions, but the statute does not specifically give the government such authority.

Although the issue concerning whether the district judge with original jurisdiction has au-

thority to amend bond conditions despite not being the "releasing authority" under § 3146 was not specifically raised by appellants, appellants broadly asserted that the district court lacked the authority to enter the amendments in this case; hence, we consider the issue properly before us.

§ 3146(e), he could not amend the bond set by the magistrate unless he found the magistrate's order "clearly erroneous." [8]

The Second Circuit rejected this argument and affirmed the district judge. The court reasoned that because conditions of bail govern release "pending trial," 18 U.S.C. § 3146(a), the conditions necessarily extend into a period during which the judge with original jurisdiction over the case would be exercising that jurisdiction as to pre-trial matters. He therefore must have the authority to make such orders he deems necessary to ensure the presence of the defendants at trial, and the government should be able to invoke that authority. The court, moreover, noted that in many cases (such as the case before us) the defendant's initial appearance would occur in a district other than that of prosecution; in such cases, insisting that the government return to the original releasing officer to request amendments to the conditions of bail would be a gross waste of resources. Finally, the court concluded that because the range of officers empowered to set initial release conditions covered a wide variety of persons, including local justices of the peace, Congress likely did not intend that the conditions be immune from supervision by the trial judge.

We find this reasoning persuasive and adopt it as our own. Thus we hold that despite the fact the district judge was not the releasing officer under § 3146(e), he had authority as the court with original jurisdiction over the case to amend the conditions of appellants' release on motion by the prosecution.

### III. The Legality of the Amended Bond

Appellants also attack the legality of the amended bond on several grounds. First they assert that the policy of the Northern District of Florida not to accept property bonds is contrary to the primary policy behind § 3146, which is to permit release of the defendant pending trial under the least restrictive condition compatible with assuring the future appearance of the accused. *United States v. Cramer*, 451 F.2d 1198 (5th Cir. 1971). *Accord, United States v. Honeyman*, 470 F.2d 473 (9th Cir. 1972); *United States v. Smith*, 444 F.2d 61 (8th Cir. 1971), *cert. denied*, 405 U.S. 977, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); *United States v. Bronson*, 433 F.2d 537 (D.C.Cir.1970).

Because of the clear purpose behind § 3146, we would have difficulty with upholding the legality of denying or altering a property bond solely because of a stated policy against those bonds. Such a situation is not present in this case, however. Although the trial court's orders[9] asserted

---

**8.** 28 U.S.C. § 636(b)(1)(A) authorizes a judge to reconsider a pre-trial matter first determined by a magistrate if "the magistrate's order is clearly erroneous or contrary to law."

**9.** The order amending James' bond stated:

At the conclusion of the motions hearing in this case the government moved to modify the conditions of Mr. James' bond. After consideration of the factors set forth in Title 18, United States Code, Section 3146, I granted the motion, raising Mr. James' bond to $2,000,000.00 cash or corporate security. My reasoning was set out in open court. This order reiterates it.

Mr. James was originally released on $1,000,000.00 bond, $50,000.00 full surety, $500,000.00 personal surety, and another $450,000.00 personal surety cosigned by two other people. The personal surety bonds were secured by property.

The type of surety allowed Mr. James is unacceptable. According to the parties, the Magistrate allowed Mr. James to post proper-

ty because the United States Attorney agreed to the arrangement, apparently because he was involved in plea negotiations of some sort with Mr. James. The judges of this district have steadfastly refused to accept property as bond security. The United States Attorney is not a judge of this district and cannot by his agreement alter the policies of this court. The policy against accepting property bonds is the reason for modifying the conditions of James' release to require full or corporate surety.

Two of the factors to be considered in determining conditions of release, set forth in Title 18, United States Code, Section 3146(b), are the reasons for the increase in James' bond. The weight of the evidence against Mr. James is heavy. That determination follows from my rulings on the motions to suppress, taped telephone conversations provided in the *ex parte in camera* hearing held on the motion to disqualify James' attorneys, and transcripts of the Grand Jury testimony

that the policy of the Northern District against property bonds was a reason for altering the type of security, as opposed to the amount, a reading of the orders as a whole indicates that the court's primary concern in altering the bonds was assuring that James and Fernandez would be present at trial. In the body of each order, for example, the court specifically discussed the factors under § 3146 weighing in favor and against an amended bond. In the Fernandez order, the trial court also specifically noted that the $2 million property bond was "the minimum needed to secure his appearance at trial." In the final paragraph of the James order, moreover, the trial court stated, "I find a bond of $2 million, cash or corporate surety, is the minimum required to ensure James' attendance at trial." Hence we find that because the primary purpose of the bond amendments in this case was to secure appellants' future presence and not merely to implement a policy against property bonds, the amendments were not illegal.

■■■ Appellants also urge that the amended bond denied them their eighth amendment rights to be free from excessive bail and that the trial court's reasons for amending the conditions of release were inadequate. We disagree. The basic test for excessive bail is whether the amount is higher than reasonably necessary to assure the accused's presence at trial. *United States v. Beaman*, 631 F.2d 85, 86 (6th Cir. 1981); *United States v. Wright*, 483 F.2d 1068, 1070 (4th Cir. 1973); *United States v. Bobrow*, 468 F.2d 124, 127 n.16 (D.C.Cir. 1972). As long as the primary reason in setting bond is to produce the defendant's presence, the final amount, type, and other conditions of release are within the sound discretion of the releasing authority, and we may review only for an abuse of that discretion. *United States v. Cook*, 428 F.2d 460, 461 (5th Cir. 1970). *Accord United States v. Archie*, 656 F.2d 1253, 1258 (8th Cir. 1981). *See United States v. Zuccaro*, 645 F.2d 106–07 (2d Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 110, 70 L.Ed.2d 96 (1981).

After reviewing the record and the district court's orders in this case, we conclude that the amended bond was not excessive and no abuse of discretion occurred. The court below specifically examined the various factors listed in § 3146 and, after hearing a substantial portion of the government's evidence in the case relating to earli-

---

of Clyde William Cobb, Thomas Dan Abbey, Patrick Lloyd Robinson, and Thomas E. Alexander. Not only is the evidence persuasive, Mr. James as an experienced criminal attorney, unlike most defendants, is capable of accurately assessing its impact and the future it portends.

The second factor causing modification of James' bond is the nature and circumstances of the crime. James is charged with being a major planner of and participant in a large, wide-ranging, complex, effective, highly profitable, drug importation conspiracy of at least four years duration. Mr. James is charged with using his legal talents to facilitate the enterprise. The charges and supporting evidence indicate Mr. James would be as likely to exploit the law's failings in his own behalf as readily as he did on the conspiracy's.

Other factors listed in section 3146 weigh in Mr. James' favor. While he has no strong ties to the Northern District of Florida, he has strong family ties to Key West in the Southern District, and he is a long-time resident of Key West. James has no convictions and has never failed to appear at a court proceeding; in fact he turned himself in when he learned of this indictment.

One other factor weighs in my bond modification decision. James has demonstrated an ability to disappear from the country for an extended period of time. The evidence against him coupled with his ability to evaluate it give him great motivation to fail to appear. The nature and circumstances of the crime show James has no compunction about disobeying his oaths and court rules. His previous sojourn outside the jurisdiction shows his ability to avoid trial by departing. These factors outweigh both the presumption that a defendant will appear for trial and the other factors weighing in James' favor.

I find a bond of $2,000,000.00, cash or corporate surety, is the minimum required to ensure James' attendance at trial. All other conditions of release previously imposed, including restriction of travel to the Southern District of Florida, except for travel to the Northern District for proceedings in this case, remain in effect.

DONE AND ORDERED this 20th day of January, 1982.

The Fernandez order was substantially similar.

er pre-trial motions, concluded that the seriousness of the offense, the severity of the possible sentence, the central roles of James and Fernandez in the illegal enterprise, and the weight of evidence against each man created a significant risk of flight which warranted the amended bond. The explanation given by the trial court comported with the requirements of § 3146, and demonstrated that the primary purpose behind the amended bond was to reasonably assure the presence of James and Fernandez at trial.[10] Accordingly, the orders of the district court amending the bonds of appellants are affirmed.

AFFIRMED.

CLARK, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's reasoning in Part II of their opinion. I cannot, however, concur in either the rationale or the result in Part III. In Part II, the majority properly rejects the appellants' contention that before an appearance bond may be increased the prosecution must demonstrate that the defendant has violated, or is about to violate, a condition of release. The majority reaches this result by scholarly analysis of the statutory scheme. I add only that under the Bail Reform Act reasonable assurance of the presence of the defendant at trial is the touchstone. Thus under the Act something less than proof of violation or impending violation of a condition of release may support an increase in the amount or terms of the appearance bond.

Nonetheless, the majority does not give sufficient deference to the intent of Congress expressed in the Act and the presumption which the Act creates. Before exploring the instant facts and considering appellants' specific claims, I am compelled to provide what I believe the majority does

not, a "flavor" of the new approach to bail which Congress established in the Act.

From its earliest applications, the newness in letter and spirit of the Bail Reform Act created an anxiety in the judiciary.

We can appreciate the disquiet a trial judge may feel on occasion in releasing a person charged with a dangerous crime because the Bail Act requires it, a feeling we have at time shared.

*United States v. Leathers,* 412 F.2d 169, 170 (D.C.Cir.1969).

But when the statute and its legislative history are unambiguous, as is the case with the Bail Reform Act, none of us on the bench has any serious alternative but to put aside his personal doubts and to apply the Act as Congress has written it.

*Id.* at 170 (footnote omitted).

Clearly, Congress established in the Act a new approach to bail.

The Act creates a presumption in favor of releasability on personal recognizance or upon the execution of an unsecured appearance bond. It is "only if 'such a release will not reasonably assure the appearance of the person as required' that other conditions of release may be imposed." Congress has established a hierarchy of less favored conditions which may be considered, but which may be utilized only in the event that no preferred condition is deemed adequate to assure appearance. And so it is that the imposition of a money bond is proper only after all other nonfinancial conditions have been found inadequate.

The low priority given by Congress to monetary conditions was enacted into the statute in order to prevent pretrial detention resulting from indigency. The authors of the Act were fully aware that the setting of bond unreachable because of its amount would be tantamount to ·

10. Appellants intimate that James' bond amendments were the result of James' decision not to cooperate with the government in its investigation and prosecution of the marijuana enterprise. The record, however, does not support this charge. Although the fact of his non-cooperation was mentioned at the bond hearing, the primary grounds for the government's motion were the weight of the evidence against James and the fact that James had demonstrated the ability to remain beyond the jurisdiction of the United States as evidenced by his 18-month Caribbean trip prior to the indictment. James' failure to cooperate, moreover, was not mentioned in the trial court's order amending the bond conditions.

setting no conditions at all. Conditions which are impossible to meet are not to be permitted to serve as devices to thwart the plain purposes of the Act, nor are they to serve as a thinly veiled cloak for preventive detention.

*Id.* at 171 (footnotes omitted).

The legislative history is clear: a new approach was decreed in the Act; a presumption of reliability was created; a new method of arriving at bail conditions was required. The particulars of the Act's requirements will be explored after first reviewing the facts.

On September 30, 1981, the magistrate in the Southern District of Florida conducted an extensive bond hearing. Mary Lloyd, a friend of Mr. James's mother and a teacher in Key West, Florida, testified as to Mr. James's reliability and dependability and pledged her home as security for his release.

Joseph Scafuti, Mr. James's brother-in-law and the Vice President of the First Federal Savings & Loan Association of Key West, attested to Mr. James's reliability based on both personal knowledge and a long-term professional relationship. Mr. Scafuti and his wife were prepared to pledge their home valued at approximately $100,000, a lot in Florida valued at $20,000, as well as their interest in a third piece of property as collateral for a surety bond.

Mr. James testified that he had been a lifelong Key West resident. After attending college and law school in the state of Florida, he had served as a city attorney of Key West, Florida. In November of 1979, he left the United States. Although he was then aware of the ongoing investigation, he testified that he left because of his poor health and because he had been advised that the Florida Department of Criminal Law Enforcement had learned, through a wiretap, of a contract being put out on his life. He returned to the United States in September of 1980 for his daughter Suzy's birthday, in March of 1981, when he spent a day and a half in Key West, and finally in August. He further testified that while he was out of the United States he was in frequent contact with Mr. Geeker, the U. S. Attorney in the Northern District of Florida. When he first heard about the indictment on the radio, Mr. James immediately surrendered to answer the indictment.

Mr. James testified that it was his intention to remain in the United States and contest the charges against him. He pointed out that he had access to a boat and could have left the country if he had chosen to do so. When he surrendered, he knew his bond had been set at $20,000,000 and that at least one of the co-defendants was rumored to have already pled guilty and was cooperating with the government.

After testimony was taken, a recess was called after which the following transpired:

MR. ZIMET [Assistant United States Attorney]: Your Honor, during the recess, I spoke to Mr. Geeker, who is the United States Attorney for the Northern District of Florida; and I informed him of what had happened during the course of the bond hearing and I advised him as to the testimony of Mr. James and the testimony of the other witnesses and the Court's position towards the bond.

He has informed me that in light of the evidence which was presented here, as well as other factors which he understands about the case, that he recommends that the Government recommend to the Court the following—and I have spoken to Mr. Sclafani [Attorney for Mr. James] and I believe these terms are acceptable to Mr. Sclafani—number one, that Mr. James' bond be reduced to the amount of one million dollars; that bond be in the following form; a $50,000 corporate surety bond, a $500,000 personal surety bond, as well as a $450,000 personal surety bond which is secured by the property which we have heard testified to during the course of the examination by the witnesses today.

Additionally, as part of that reduction, Mr. James will today waive removal to the Northern District of Florida and be present in the Northern District of Florida at a time and place discussed with Mr. Sclafani, Mr. Geeker, sometime tomorrow.

Transcript at 105–06. The parties' agreement notwithstanding, the magistrate hesitated.

Prior to commencing Court this morning, as it is my practice, when conceivably possible, I telephoned Judge Higby who advised me that he was more than exceedingly reluctant to reduce the bond; that he did not want the bond reduced; that he wanted the bond hearing and everything else held in Pensacola.

Transcript at 110. During a recess, the magistrate had again contacted Judge Higby and indicated to him that in light of the testimony she would set what she believed to be a reasonable bond.

Judge Higby respectfully disagreed with me. Judge Higby advised me that he felt that, in light of the situation, that the United States Attorney's Office should have the opportunity to conduct a bond hearing in Pensacola before a Magistrate . . . .

Transcript at 111. The magistrate indicated that in her experience it was often futile for a magistrate to set a bond which was not in accord with the district judge's wishes. She indicated that pursuant to the agreements that had been made between the parties she had attempted to contact Judge Higby again, but he had left his office. After another recess, the court set the bond.

THE COURT: Okay. That is over. It's real simple.

I have the legal and absolute authority to set a bond that I want to set that I feel is appropriate. I not only have the authority to do so, I'm directed by law to do so.

Bond is hereby set in the amount of one million dollars of which $50,000 shall be surety; $500,000 shall be personal surety to be signed by Mr. James; $450,-000 shall be personal surety to be signed today by Mr. and Mrs. James, the Defendant's mother and father. [The bond was co-signed by Elizabeth James and Joseph F. Scafuti.]

Transcript at 116.

Mr. James was restricted to travel within the Southern District of Florida and "travel to and from Pensacola as ordered by the Court at a time and date as ordered by the Court or *as agreed upon between Mr. Sclafani and Mr. Geeker* and as approved by the Court." Transcript at 117 (emphasis supplied).

The majority's account of the proceedings before Judge Higby needs amplification. The hearing was held four months after the initial bond hearing, during which time, parenthetically, James had attended several hearings in Pensacola. Consideration of what happened on January 14, 1982 is necessary to understand this case completely.

The bond modification occurred at the end of three days of hearings concerning various pretrial motions. The defendants were not notified of the government's intention to seek an increase in the bond. At the beginning of the hearing, the United States Attorney moved to reinstate the original bond saying that the court had had an opportunity to hear a substantial amount of the evidence and that the bond was a property bond. Finally, he argued that Mr. James had "demonstrated an ability to remain beyond the jurisdiction of the United States." In response, counsel for Mr. James pointed out that Mr. James had surrendered immediately upon the issuing of the indictments, noting that he could have been outside the reach of the United States at that time. He noted the extensive evidence that was before the magistrate at the bond hearing and that Mr. James had appeared at every proceeding in the Northern District of Florida up to that time. Mr. James told the court that his mother and sister had put up every piece of property they owned. The court then responded:

I'm not going to revoke your bond, but I don't think the bond is sufficient at the present time. *To start off with, we don't accept property in the Northern District of Florida for surety.*

Transcript at 9 (emphasis supplied).

I don't know who accepted it, but the Court hasn't accepted it. Maybe the U. S. Attorney has accepted it, but I certain-

ly haven't. I didn't know it until it was pointed out to me here yesterday or the day before that that was the situation. I didn't know what the bond situation was.

Transcript at 9. At this point, the U. S. Attorney [Mr. Moore] indicated:

There was one point I didn't address and that was that this bond was originally set in the Southern District of Florida by the magistrate there. I don't have the transcript of that hearing, but there was conversation with the United States Attorney for the Northern District of Florida [apparent reference to Mr. Geeker] as far as what bond was going to be set. And I may be factually in error on this point, but I think Mr. James may have himself spoken to the U. S. Attorney and it's my understanding that, at that time, there was some discussion of Mr. James' cooperation with the Government. And the U. S. Attorney has indicated to me that that weighed heavily in his agreement that—to an alteration of the bond, with the understanding that Mr. James would immediately present himself in the Northern District and possibly engage himself in conversation toward that cooperation.

Transcript at 10–11. After the defense requested 72 hours to make arrangements to post the bond, which the judge denied, the court stated:

THE COURT: Well, I have been stung so many times on these bonds that these characters that precede you make it kind of a hard act to follow. I've had defendants show up under a quarter of a million dollar bonds and then when we get ready to go to trial, they're gone, as in Mr. Gonzales who had showed up for a three-week smuggling trial in Puerto Rico everyday, which was acquitted, had a good record of appearance.

In any event, I'm going to change the conditions of the bond for the reasons stated by the U. S. Attorney; that is, I don't believe the magistrate had before him or her the weight of the evidence that I have considered in these three days of hearings. *But primarily for the reason*

*that we're not in the business of litigating property bonds in the Northern District of Florida.* If the property is worth what it is said to be worth, it can be hocked and the money can be put up in lieu of the property.

Consequently, I'm going to change the conditions of release of Mr. Fernandez to require that he post a $2,000,000 cash or full surety bond without regard to corporate surety, without regard to any property deed put up. And likewise, the same will apply to Mr. James, that he will post a $2,000,000 full cash or corporate surety bond.

As a matter of fact, it will amount to a reduction of Fernandez' bond because his bond is set at 5,000,000, but he's got property up which is unacceptable. So he's going to have to put up full cash or corporate surety and the same will hold true with Mr. James, $2,000,000 full cash or corporate surety.

Transcript at 13–14 (emphasis supplied). Discussion continued for some time. At one point after the judge indicated that a $2,000,000 bond full cash or corporate surety was reasonable, he said, "I'm changing the bond *conditions*." Transcript at 19 (emphasis supplied).

*The Property Bond Policy—The Question is Avoided*

The majority does not address the substance of appellants' attack on the Northern District of Florida's refusal to accept property bonds. They seem to agree that refusal is contrary to the policy behind § 3146. The majority notes: "We would have difficulty with upholding the legality of denying or altering a property bond solely because of a stated policy against those bonds. Such a situation is not presented in this case, however."

Under this approach, a no-property-bond policy would forever be immune from attack. I can conceive of no stronger case in which a property bond is denied because of such a local policy. The unacceptability of the type of surety allowed Mr. James is the *first* reason stated in Judge Higby's order.

In the order modifying Mr. Fernandez's conditions of release, Judge Higby states:

According to the lawyers the property security was agreed to by the United States Attorney. The United States Attorney, however, is not a judge of this district and cannot alter this district's long-standing policy against property bonds. Because of that policy, I modified Mr. Fernandez' conditions of release to require cash or corporate surety.

The judge lowered Fernandez' bond from $5,000,000 to $2,000,000 because of his belief that $2,000,000 was the minimum needed to secure his attendance at trial. "[I]t is as effective an assurance when backed by cash or corporate surety as the $5,000,000 secured only by property and notes." Thus, particularly in Mr. Fernandez' case, the only reason to modify the conditions of release was the unacceptability of the property bonds.

Judge Higby made clear during the hearing that *principally* he was modifying the *condition* of the bond; that is, the nature of it rather than the amount. Each time his reasons are given, he discusses the nature of the bond as a property bond first or the term "primarily" is used. The nature of the bond must be the primary reason for the change in bond condition in light of the weakness of the other factors noted by Judge Higby. As to both defendants, he relies on the strong weight of the evidence against Mr. James and Mr. Fernandez and, as to Mr. James, his experience as a criminal attorney, the latter because it made James capable of accurately assessing the impact of the evidence. After the earlier hearings, the defendants were as well aware of the strength of the case that might be brought against them. Mr. James was no more experienced in January than he was in September.

Additionally, the judge considered the nature and circumstances of the crime. The magistrate too had the indictment before her and knew of the nature and circumstances of the crime when she set bail. I note with some concern that Judge Higby takes the accusations against Mr. James as proven when considering the reasons for modification. "The charges and supporting evidence indicate Mr. James would be as likely to exploit the laws' failings in his own behalf as readily as he did on the conspiracies." Such reasoning goes further than a consideration of the nature and circumstances of the crime. The character of the defendant was improperly viewed in light of the changed circumstances *taken as proven.*

As indicated in the transcript of the hearing, the judge was also influenced by having been recently "stung" by previous defendants. Thus, not only did unproven facts weigh against the defendants, but the accusations put forth against others supported, in the trial judge's eyes, a modification in these defendants' bail.

*The Property Bond Policy—An Affront to Legislative Intent*

The majority acknowledges that they would have difficulty upholding the Northern District of Florida's property bond policy. I agree. The legislative history of the Bail Reform Act of 1966 is a substantial hurdle which the majority avoids crossing. Additionally, an examination of that history elucidates how the trial judge improperly focused his inquiry when modifying the bail. I quote from that history extensively.

In the United States, bail practices and rights developed a different pattern from that in England. The eighth amendment to the Constitution of the United States states only that "Excessive bail shall not be required." Thus, there is no specifically granted right to bail. Since the Judiciary Act of 1789, however, Congress has provided that persons shall be admitted to bail upon arrest in criminal cases except where the punishment may be death. It also provided that bail is discretionary in capital cases depending upon the nature and circumstances of the offense and of the evidence and usages of law. The practice of providing a private surety who would personally guarantee to produce his bailee proved inadequate. Eventually, the posting of bail became the function of a professional bondsman who

in return for a money premium guaranteed the appearance of the defendant at the time of trial. It was also in this manner that the posting of bail bonds became a commercial venture.

The experience of many years of bail practices in the United States became the subject of criticism in the 1920's. Since then, the bail procedures have been subject to increasing criticism. Studies of the administration of criminal justice have shown that in many instances these procedures actually fail to give proper protection to the essential rights of the accused. The practice in admitting persons to bail which places primary reliance on financial inducements as the means to assure the presence of the accused at the time of trial seems to ignore the fact that those defendants of limited means who are unable to secure the necessary bail are faced with an impossible situation.

Recently, the Attorney General's Committee on Poverty and the Administration of Criminal Justice Procedure submitted its report where it made this conclusion:

> The bail system administered in the Federal courts, relying primarily on financial inducements to secure the presence of the accused at the trial, results in serious problems for defendants of limited means, imperils the effective operation of the adversary system, and · may even fail to provide the most effective deterrence of nonappearance by accused persons.

The present system of monetary bail would be adequate if all could afford it. The facts, however, are to the contrary. The rich man and the professional criminal readily raise bail regardless of the amount. But it is the poor man, lacking sufficient funds, who remains incarcerated prior to trial. But the mere incarceration is not the only evil effect of the monetary bail system. Studies have shown that failure to release has other adverse effects upon the accused's preparation for trial, retention of employment, relations with his family, his attitude toward social justice, the outcome of the trial, and the severity of the sentence. For example, in preparation for his trial, the defendant who remains in jail does not have the same access to his counsel as the man free on bail. He is limited in his ability to collect witnesses for his defense. Often, he loses his employment, his family may become the subjects of welfare payments, and in many instances in the Federal system he becomes a financial burden to the Federal Government in that the Federal Government reimburses local authorities when a defendant is incarcerated in a local jail.

It is the opinion of your committee that the enactment of this legislation will result in achieving the goal of eliminating the evils which are inherent in a system predicated solely upon monetary bail. It will provide reforms that are long overdue and badly needed.

The President of the United States, in his recent crime message to the Congress, requested reform of the bail system. That message stated as follows:

> We must reform our bail system.

> The administration of criminal justice must be fair as well as effective.

> Whether a person, released after arrest, is likely to flee before trial or endanger society is not determined by the wealth he commands. Yet all too often we imprison men for weeks, months, and even years—before we give them their day in court—solely because they cannot afford bail.

> Effective law · enforcement does not require such imprisonment.[1]

The "wealth" of the middle and lower income classes is the equity value in their property, principally their homes. Often, as here, a defendant may be additionally supported by the property wealth of family and friends. By denying property bonds,

---

1. H.R.Rep.No.1541, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Ad.News 2293, 2298–99.

the Northern District of Florida severely weakens the ability of members of those classes to be free pending trial. This clearly violates the purpose of the Bail Reform Act,

> which is to revise practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest.[2]

### The Elements of Bail Analysis—A Contrast in Styles

A number of witnesses who testified during the Bail Reform Act hearings expressed the opinion that the primary focus of bail hearings should be on the accused's stability and his roots in the community. The legislative history reflects that this testimony led, in part, to the additional factors stated in the Act: accused's mental condition, family ties, employment, length of residence in the community, and record of appearance.

The Act establishes a priority system with the least restrictive form of restraint preferable over the more restrictive. Again, the legislative history is helpful. SEC. 2. (a) The Congress finds that—

> (1) Present Federal bail practices are repugnant to the spirit of the Constitution and dilute the basic tenets that a person is presumed innocent until proven guilty by a court of law and that justice should be equal and accessible to all;
>
> (2) Persons reasonably expected to appear at future proceedings should not be deprived of their liberty solely because of their financial inability to post bail;
>
> (3) Respect for law and order is diminished when the attainment of pretrial liberty depends solely upon the financial status of an accused;

> (4) Bail practices which rely primarily on financial consideration inevitably disadvantage persons and families of limited means;
>
> (5) The high cost of unnecessary detention impose a severe financial burden on the taxpayers and deplete public funds which could be better used for other public purposes;
>
> (6) Family and community ties, a job, residence in the community, and the absence of a substantial criminal record, are factors more likely to assure the appearance of a person than the posting of bail; and
>
> (7) Accused persons should not be unnecessarily detained and subjected to the influence of persons convicted of crimes and the effects of jail life; nor should their families suffer needless public derision and loss of support.

(b) The purpose of this Act is to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest.[3]

Unlike the magistrate, who, in accordance with the purposes of the Bail Reform Act, focused on family and community ties, a job, residence in the community, and absence of a substantial criminal record, Judge Higby focused on the weight of the evidence, the nature of the crime, and principally, it appears to me, the use of a property bond. Judge Higby's approach then more closely resembled the older condemned approach and less the approach required under the Bail Reform Act.

### The "Element" of Noncooperation

I take issue with the majority's treatment of a major issue in this case in a footnote. In footnote 10, the majority says the record does not support the appellants' contention that "James' bond amendments were the

---

2. *Id.* at 2299.

3. S.Rep.No.750, 89th Cong., 1st Sess. These expanded findings and purpose were eventually condensed in the final version.

result of James' decision not to cooperate with the government in its investigation and prosecution of the marijuana enterprise." The majority concedes that the fact of noncooperation was mentioned at the bond hearing. Nonetheless, as with the property bond issue, the majority insists that the primary grounds for the government's action were the weight of the evidence against James and his demonstrated ability to remain beyond the jurisdiction of the United States.

James's failure to cooperate was not mentioned in the trial court's order amending the bond conditions. There was nothing in the record to indicate that it was the basis for Judge Higby's decision. Nonetheless, we cannot ignore that the government had agreed to certain conditions of bond in September and in January sought to have those conditions changed. It is also not refuted that the conditions were set, at least in part, because of some indication that the defendant might cooperate with the government. By January the defendant had not cooperated. There may be circumstances in which, although there has been a failure to cooperate accompanied by a change in government position, additional considerations justify bail modification. At the very least, however, such a situation should receive close scrutiny by the appellate court. I believe that the trial judge's action here would not withstand such scrutiny.

*Conclusion*

The majority does not consider the legality of the policy which forbids property appearance bonds. The Northern District of Florida's policy adversely impacts on a group of defendants classified on economic lines. Under this policy, the members of lower and middle economic classes are much less likely to enjoy pretrial freedom than more affluent persons. Such a result is precisely what Congress sought to avoid in enacting the Bail Reform Act. I cannot concur in such a result, and I would strike down the policy as violative of the Act.