**UNITED STATES of America, ex rel., Alvaro GARCIA, Petitioner-Appellee,**

v.

**James F. O'GRADY, Sheriff of Cook County, Respondent-Appellant.**

No. 86–2559.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1986.

Decided Feb. 20, 1987.

As Amended Feb. 20, 1987.

Karen Dimon, Asst. State's Atty., Chicago, Ill., for petitioner-appellee.

Edward Mogul, Chicago, Ill., for respondent-appellant.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Respondent-appellant James F. O'Grady, Sheriff of Cook County, Illinois, appeals the district court's grant of a writ of habeas corpus to Alvaro Garcia, petitioner-appellee, 643 F.Supp. 922 (1986). We reverse.

### I.

On September 24, 1985, petitioner Alvaro Garcia, along with Wilfredo Noriega and Miguel Fleites, was arrested and charged with delivery of a controlled substance, Ill. Rev.Stat. Ch. 56½, § 1401, and calculated criminal drug conspiracy, Ill.Rev.Stat. Ch. 56½, § 1405(b). At a bond hearing held on September 25, 1985, after hearing some 29 pages of transcribed testimony, the Circuit Court of Cook County, Illinois set bond at $12 million.[1] On October 3, 1985, a second bond hearing was held to consider Garcia's motion for a reduction in bond. At both hearings testimony was offered that: Garcia, now a naturalized United States citizen originally immigrated from Colombia, South America, lived and worked in Miami, Florida, some members of his family still resided in Colombia, and Garcia not only frequently travelled to Colombia but was also building a house there.

At the September 25, 1985, bond hearing at which Garcia was represented by counsel, Officer Stanley A. Turner of the Chicago Police Department testified that Garcia was involved in *a multimillion dollar drug conspiracy that stood to make over $14 million with him alone in Chicago.*[2] Turner stated that Garcia had agreed *to sell him two kilograms of cocaine for $85,000*[3] and that the two of them had

1. The prosecutor, Ms. Wirth, stated the following at the September 25, 1985, hearing in requesting a bail bond of $12 million (Miguel Fleites was mistakenly referred to as Flutes throughout the September 25 hearing):

   As to Garcia and Flutes [sic], we are asking for the highest bond for the following reasons. They are principal actors in this crime that was committed. In their conversation with the officer they have indicated a total lack of ties to the community although you have heard testimony about trips to and from Columbia. [sic] Given the fact that both Mr. Garcia and Mr. Flutes demonstrated and repeatedly stated to the officer their ability to deliver seven kilos a week on Thursday, every week, *frequent trips to Columbia [sic] are a real probability in order to fulfill that promise.* (Emphasis added).

2. The relevant testimony by Officer Turner included:

   Q. [*MS. WIRTH* (Counsel for the Prosecution)]: What did you hear from Mr. Flutes [sic] about his ability to do business?
   A. [*OFFICER TURNER*]: Mr. Flutes [sic] stated to me that there would be no problem doing six or seven keys per week, Thursday, Friday, it doesn't make any difference.
   \* \* \* \* \* \*
   Q. Do you know whether or not the cocaine transactions are limited solely to the Chicago area?
   A. Mr. Flutes [sic] stated to me that the Sunday prior he had sold five kilograms of cocaine and he wanted to complete this transaction because he had to go to New York and cover an additional transaction there.

Counsel for the prosecution in arguing for a high bail bond noted the magnitude of the alleged conspiracy:

> MS. WIRTH: And we have heard the defendants boast that they are making other cocaine deliveries in Chicago. And they are doing other business in New York and they talk about the way business has been done in Miami.
>
> Their ability to do seven kilos a week with this officer, they have an ability way beyond what you and I can imagine. Based upon seven kilos a week, at a purchase price of $42,500, that means in one month just with this officer in Chicago they would make one million one hundred 88 dollars per month just from this officer not counting New York and not counting Miami and not including other people in Chicago or any other state. That means in one year just with this officer just in Chicago they would make 14 million 256 thousand per year which I think is a conservative estimate. We have not talked about their entire ability to do business.

(Emphasis added).

3. The relevant testimony by Officer Turner provided:

   Q. [*MS. WIRTH*]: Was there a representation ever made as to what substance was?
   A. [*OFFICER TURNER*]: Yes.
   Q. And who made that representation?
   A. Both Garcia and Miguel Flutes [sic].
   Q. What did they say?
   A. "This is over 90 percent cocaine."
   Q. When you viewed the substance and saw it was rock like, based upon your experience as an officer, what did that mean to you?

discussed future dealings in which Garcia explained that he anticipated supplying Turner with "at least six to seven kilograms of cocaine, one every week, preferably on Thursdays."[4] Turner also testified that Fleites, one of Garcia's confederates, who was arrested with him, had stated that they were also trafficking in narcotics in the cities of New York, Miami and Chicago and that Fleites on one occasion had to kill a person because of a problem in a drug transaction and intimated he would kill Turner or his partner if he discovered they were law enforcement officers.[5] The police report detailing Garcia's arrest states that the cocaine in Garcia's possession had a street value of $607,722. Although Garcia denied at the second bail hearing having discussed the sale of drugs with Officer Turner, he did nothing to controvert at the first or the second hearing the government's testimony that he had no contacts with Illinois much less the city of Chicago.

At a subsequent bond reduction hearing a little more than a week later, on October 3, 1985, in which the trial judge heard 58 pages of transcribed testimony, the circuit court reduced Garcia's bail bond from $12 million to $607,000.[6] At the same hearing, Garcia requested a further reduction of his bail, which was denied. He then appealed the denial of the $607,000 bail reduction

> A. That it was in fact cocaine of a high grade quality.
>
> The following exchange took place on cross-examination by Garcia's attorney, Mr. Zunganelis:
>
> Q. [MR. ZUNGANELIS]: How did you figure out the street value?
>
> A. [OFFICER TURNER]: Per the $42,500 I was to pay to Mr. Garcia and for 90 percent cocaine or better than 90 percent, we have a chart. It is put out by the government that states categorically states that at 90 percent this will be the estimated street value which came out to be $607,722, and it's a 1984 chart.

4. The relevant testimony from the September 25, 1985, hearing provided:

> Q. [MS. WIRTH]: From whom did you learn about the ability to obtain additional cocaine?
>
> A. [OFFICER TURNER]: From both Garcia and Flutes [sic].
>
> Q. And relative to doing further business with them, what did you learn from them?
>
> A. We talked about the transaction which was for 2 kilos of cocaine for $85,000. We stated that that amount was in excess of what we really wanted to pay but we would pay it this time. We talked about doing future business in the amount of at least six to seven kilograms of cocaine, one every week, preferably on Thursdays.
>
> Q. That would amount to about one kilo per day throughout the entire year, is that correct?
>
> A. Yes.

5. The relevant testimony regarding Garcia's compatriot Mr. Fleites provided:

> Q. [MS. WIRTH]: What did you hear from Mr. Flutes [sic] about his ability to do business?
>
> A. [OFFICER TURNER]: Mr. Flutes [sic] stated to me that there would be no problem doing six or seven keys per week, Thursday, Friday, it doesn't make any difference. He is a small man, small in size, and he has done

> transactions before and will continue to do transactions, but in this particular transaction he wanted some type of security inasmuch as he could not afford to take a fall on the two kilos because he is responsible for it, but it is not his. He stated to me that he is from Miami. *He stated that things were done differently in Miami and in one previous incident he had a problem with a transaction of cocaine in Miami and that he had to kill that person.*
>
> \*   \*   \*   \*   \*   \*
>
> [THE WITNESS (OFFICER TURNER)]: He also stated to me that this is in fact a business transaction and in this business transaction he is not trying to create a problem, but he wants us all to understand what that nature of this transaction is. He also stated to me that if he received a piece of paper from a law enforcement official or anyone similar that *he would have to take the same action that he took in Miami to cover some type of loss.*
>
> Q. What did you interpret that to mean?
>
> A. *If he discovered during the course of the transaction we were in fact the police or any time after the transaction that we were in fact the police, he would kill myself or my partner.* (Emphasis added).

6. The written order that the circuit court entered on October 3, 1985, reflects that bond for Garcia was set at $607,000. The transcript of the bond hearing held on October 3, 1985, however, indicates that bond for Garcia was set at $670,000. The transcript of the hearing states:

> THE COURT: I have the issue in front of me and I have to resolve it. I look upon this case as the case where the legislature is speaking to me under Section 110–7, stating it is a Class X felony, and the Court may require the Defendant to deposit a sum equal to 100 percent of the bail and as to the value. Therefore, on Mr. Garcia and on Mr. Fleites, I will set the bond at $670,000 cash, and I will make it $150,000 on Mr. Noriega, cash.

ruling to the Illinois Appellate Court which denied the same. Garcia next appealed to the Illinois Supreme Court, and that court likewise refused to disturb the circuit court decision setting bail at $607,000.

Following the Illinois Supreme Court's affirmance of the Illinois circuit court's denial of his motion for a further reduction in bail, Garcia petitioned the federal district court for a writ of habeas corpus. The district court granted Garcia's petition for a writ of habeas corpus, holding that the Illinois circuit court acted arbitrarily in setting Garcia's bail at $607,000 in violation of Garcia's Eighth and Fourteenth Amendment rights stating "[w]hat controls this habeas case is that the state court judge cannot, in reaching that decision, do what Judge Kowalski has done to Garcia: surrender his judicial discretion in favor of *setting a bail amount identical to the drugs' street value*, on the mistaken assumption the Illinois General Assembly has equated street value with reasonable bail." *Garcia v. Elrod*, 643 F.Supp. 922, 925 (N.D.Ill.1986) (emphasis added). Since the record establishes the street value of the drugs was $607,722, by setting bail at $607,000 the state court judge did not set bail in an "amount identical to the drugs'

street value" as stated by the federal district judge. The respondent appeals the district court's decision granting Garcia a petition for habeas corpus to this court.

### II.

On appeal, the respondent, the Sheriff of Cook County, argues that the district court acted improperly in granting Garcia's petition for a writ of habeas corpus since the Illinois circuit court did not set Garcia's bail at $607,000 arbitrarily. Garcia maintains that the district court properly granted him a writ of habeas corpus since the $607,000 bail amount was arbitrarily excessive. In setting bail for Garcia, the state trial judge heard and considered testimony regarding the factors enumerated in the Illinois Bail Act.[7]

In *Stack v. Boyle*, 342 U.S. 1, 5, 72 S.Ct. 1, 3–4, 96 L.Ed. 3 (1951), the United States Supreme Court addressed the issue of what constitutes excessive bail under the Eighth Amendment and stated that bail is not excessive if it is "reasonably calculated" to assure the defendant's presence at trial. In *United States v. Zylstra*, 713 F.2d 1332 (7th Cir.1983) we stated:

7. The Illinois Bail Act, Ill.Rev.Stat. Ch. 38, para. 110–5(a–b) states:

(a) *In determining the amount of monetary bail or conditions of release, if any, which will reasonably assure the appearance of a defendant as required or the safety of any other person or the community,* the court shall, on the basis of available information, take into account such matters *as the nature and circumstances of the offense charged, the condition of the victim,* the likelihood of the filing of a greater charge, *the weight of the evidence against such defendant, his family ties, employment,* financial resources, character and mental condition, past conduct, prior use of alias names or dates of birth, *length of residence in the community,* whether a foreign national defendant is lawfully admitted in the United States of America, the amount of unrecovered proceeds lost as a result of the alleged offense, record of convictions, and any record of appearance at court proceedings, flight to avoid arrest or prosecution, escape or attempted escape to avoid arrest, or failure to appear at court proceedings. Information used by the court in its findings or stated in or offered in connection with this Section may be by way of proffer based upon reliable

information offered by the State or defendant. A proffer by the State must be based upon a written report. All evidence shall be admissible if it is relevant and reliable regardless of whether it would be admissible under the rules of evidence applicable at criminal trials.
(b) The amount of bail shall be:
(1) Sufficient to assure compliance with conditions set forth in the bail bond;
(2) Not oppressive;
(3) Considerate of the financial ability of the accused.
(4) When a person is charged with a drug related offense involving possession or delivery of cannabis or possession or delivery of a controlled substance as defined in the Cannabis Control Act, as amended, or the Illinois Controlled Substance Act, as amended, the full street value of the drugs seized shall be considered. *"Street value" shall be determined by the court on the basis of a proffer by the State based upon reliable information of a law enforcement official contained in a written report as to the amount seized and such proffer may be used by the court as to the current street value of the smallest unit of drug seized.*
(Emphasis added).

"Excessive bail is an amount greater than that which is reasonably necessary to ensure that the defendant will be present at trial. 'As long as the primary reason in setting bond is to produce the defendant's presence, the *final amount,* type, and other conditions of release are within the sound discretion of the releasing authority, and we may review only for an abuse of that discretion.' *United States v. James,* 674 F.2d 886, 891 (11th Cir.1982)."

*Id.* at 1337 (emphasis added). In *Zylstra,* a case involving a multi-million dollar drug smuggling syndicate known as the "Company", the defendant contended that the federal trial court violated his Eighth Amendment rights in reinstating its earlier $1,000,000 cash bond on the third day of his trial. Although *Zylstra* involved a ruling by a federal trial court during trial and the instant case involves state court bail proceedings before trial, our reasoning supporting the rejection of Zylstra's argument is equally applicable:

"It is a matter of common knowledge that the prosecution of big-time illegal drug trafficking is frequently hampered by threats to witnesses, prosecutors and even judges, which all too often are carried out. Traffic in illicit drugs is a matter of pressing national concern and the trial court was properly interested in seeing that at least one member of the 'Company's' hierarchy *would be present in court during his entire trial.*"

*Id.* at 1337–1338 (emphasis added). We will not assume when the state trial judge presiding in this case was conducting the second bail hearing, that he had either forgotten what had transpired at the previous bail hearing (eight days before) or that he was in a trance or oblivious to the drug problems besetting our country today. Justice Powell has noted the growing problem involving drug trafficking:

"The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances.

Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates."

*United States v. Mendenhall,* 446 U.S. 544, 561–62, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) (emphasis added). As noted in the dissent in *United States v. Williams,* 798 F.2d 1024 (7th Cir.1986):

"'Without a doubt, the public has a strong interest in prosecuting narcotics dealers.' *United States v. Regilio,* 669 F.2d 1169, 1173 (7th Cir.1981). 'Traffic in illicit drugs is a matter of pressing national concern....' *United States v. Zylstra,* 713 F.2d 1332, 1338 (7th Cir. 1983). Drug abuse can and does produce devastating effects in the lives of our fellow Americans, and our governmental agencies must be allowed, within the confines of our cherished constitutional safeguards, to effectively prosecute drug conspirators in this country [which requires their presence at trial]."

798 F.2d at 1045 (Coffey, J. dissenting).

In the present case, the circuit court considered Garcia's bail bond on three occasions, the first time when setting his bail and the second and third times when considering motions for bail reduction. The state trial judge granted the first motion and reduced the bail from $12 million to $607,000 but denied another motion to reduce it further. In the bail hearings, the trial judge heard evidence that occupies some 87 pages of testimony. The second hearing was held only slightly more than a week after the first bail hearing, in which the judge had heard extensive testimony concerning Garcia's background as well as the magnitude of his and his accomplice's present and past activity in cocaine trafficking. The transcript of the October 3, 1985, hearing establishes that the state judge considered and gave credence to the earlier testimony from the September 25 bail hearing involving Garcia:

THE COURT: The thing crossed my mind. That is this: I was, of course, the Judge sitting in the original bond hearing, and the officer I notice is not here for purposes of the record.

MS. WIRTH: That's correct.

THE COURT: Now, you, gentlemen, were not present at the time obviously.

MR. DEL VALLE [Counsel for Garcia and Fleites]: That's correct.

MR. ZITZER [Counsel for Noriega]: That's correct.

THE COURT: I remember a great deal of what occurred in the first part. Obviously you wouldn't know that unless you read the record. Maybe we should pass this for the moment. A copy of the record was given to me this morning, so why don't we take a look at it. You did not get a copy?

MR. DEL VALLE: We did not.

THE COURT: Would you like to take a look at it?

MR. ZITZER: Yes. If we read the record and incorporate some of the arguments that took place on and what has already been told to the Court, we can refresh our memory.

MR. DEL VALLE: Did the Defendants testify at that time?

THE COURT: They did not.

\* \* \* \* \* \*

THE COURT: ... We still have the issue which you did not hear. I did hear a great deal, not that I can remember 100 percent of everything.

There was no need for the state trial judge to repeat what had been clearly established in the record barely a week before. Both the Illinois Appellate Court and the Illinois Supreme Court properly accepted the $607,-000 bail and refused to disturb the state trial court's decision regarding Garcia's bail.

In *United States ex rel. Fitzgerald v. Jordan,* 747 F.2d 1120 (7th Cir.1984), we stated:

"In determining whether the bail is 'reasonably calculated,' the federal courts cannot be expected to conduct a *de novo* bond hearing for every habeas corpus case that comes before it. This would not only further burden the federal court system that now is having difficulty dealing with the increasing number of habeas corpus petitions, but would also repre-

sent an *unwarranted interference in the operation of the state's criminal justice system."*

*Id.* at 1133 (emphasis added). We also stated in *Fitzgerald* that " 'the only issue to be resolved by a federal court presented with a habeas corpus petition that complains of excessive bail is whether the state judge has acted *arbitrarily* in setting that bail.' " *Id.* (quoting *Simon v. Woodson,* 454 F.2d 161, 165 (5th Cir.1972)) (emphasis in original). In *Mastrian v. Hedman,* 326 F.2d 708 (8th Cir.1964), a state court set bail at $100,000 for a criminal defendant under indictment for murder. The defendant petitioned the district court for a writ of habeas corpus on the grounds that the amount of bail was excessive and arbitrary. The district court denied the petition and refused to issue the defendant a certificate of probable cause. On appeal, the Eighth Circuit, in affirming the district court's decision, stated:

"There might have been room for a difference in judgment on the amount of bail, but consideration by a federal court could not be asked or given upon that basis. A federal court would not be entitled to act in substitution of judgment for that of the state court. What the state court did would have to be beyond the range within which judgments could rationally differ in relation to the apparent elements of the situation. It would have to amount in its effect to legal arbitrariness in the administration of the bail right provided, so as to constitute a violation of due process, or to discriminatoriness in the application of the right as against petitioner, so as to constitute a violation of equal protection."

*Id.* at 711.

The district court in this case, in granting Garcia's habeas corpus petition, stated that the state court judge "surrender[ed] his discretion" and, without any further analysis, held that the Illinois circuit court had acted arbitrarily in setting Garcia's bail at $607,000 since that figure approximately equalled the street value of the cocaine seized when Garcia was arrested. The district court further stated that: "Though Judge Kowalski did not articulate his rea-

sons for acting as he did in Garcia's case, what is plain is that the judge's decision was *controlled* by the asserted street value of the narcotics...." *Garcia v. Elrod,* 643 F.Supp. 922, 924 (N.D.Ill.1986) (emphasis in original). Finally, the federal judge found that the bond set by the state trial judge, $607,000 is "identical to the drug's street value." *Id.* at 925. (This statement is, as we said, inaccurate, since the record establishes the street value of the drugs was $607,722.) The federal judge for some reason apparently refused to consider the extensive testimony (29 pages) given before the state circuit court judge just one week earlier before the same trial judge, for he simply states that the circuit court judge's "decision was *controlled* by the asserted street value of the narcotics...." *Id.* at 924 (emphasis in original). The record reveals that the Illinois circuit court judge heard extensive testimony about Garcia's activity in a nationwide cocaine traffic conspiracy as well as about his lack of any ties to the Chicago community and his conspirator's alleged participation in violence (murder) when necessary. The testimony from the October 3, 1985, hearing establishes that the state trial judge was aware of and paid credence to the factors to be considered in setting Garcia's bond:

> MS. WIRTH: The other aspect I wish to discuss is a section entitled Section 110–5 which suggests the material that the Court should take into consideration when setting bond. I would suggest to the Court that what is in that section is what was embodied in the bail section before and further embodied in case law before. There is one difference, however, and that difference being in what would appear on page 4 of the Act that

we have before us here at the bottom of the page relative to street value. Prior, I think the Act said something about testimony of the officer. The new Act suggests that a written report would suffice in lieu of personal testimony.

> THE COURT: I notice that that's in other places in the Act too in Section IV as well as on the same page that you gave me, a copy of Jim Edgar's copy of the statute.

> MS. WIRTH: That may be a moot point which we would also state.

> THE COURT: They use the word a proffer by the State must be based upon a written report. The written report would be the arrest report.

The record further demonstrates that Garcia [8] resided in Miami and made frequent trips to Colombia. He also continued to have extensive ties in Colombia, where he was building a house and where members of his family still resided. Testimony was also offered that Fleites, his colleague in the alleged drug conspiracy, had killed an individual in a previous drug transaction and would kill Officer Turner or his partner if they turned out to be law enforcement officers. The seriousness of such threats of violence cannot be taken lightly since "It is a matter of common knowledge that drug trafficking is a violent enterprise and that government agents [and state law enforcement officers] operating undercover face the constant risk of death or serious injury." *United States v. Zylstra,* 713 F.2d 1332, 1340 (7th Cir.1983).

The transcripts from the bail hearings clearly establish that the circuit judge heard not only testimony as to the street value of the drugs but also testimony re-

---

8. In *United States v. Gomez,* 797 F.2d 417 (7th Cir.1986), the defendant objected to the government's statement at the sentencing hearing of the "disturbing trend" in drug cases of the frequent involvement of recent immigrants of Cuban and Colombian origin. We stated: "That does in fact appear to be a disturbing problem publically recognized, disturbing not just to prosecutors, but to courts and to citizens generally." *Id.* at 419. In rejecting the defendant's claim that the trial court relied on unsubstantiated information about his illegal entry from Colombia into the United States, we said:

"[t]he [trial] court's concern was not ethnic, but geographic, geographic because Colombia has the reputation of being narcotically troublesome. The flow of drugs from certain Latin countries along with the flow of people from those countries constitutes a part of the narcotics problem to be dealt with, not just by the Coast Guard, Customs and Immigration authorities, but by prosecutors and courts as well."

*Id.* at 420–21.

garding: (1) the seriousness of the charges against Garcia (delivery of a controlled substance and calculated drug conspiracy), a Class X felony which carries a sentence of not less than six years nor more than thirty years if convicted; (2) Garcia's involvement in a large drug distribution operation in Miami, New York, and Chicago and arrangement to sell Officer Turner two kilograms of cocaine, with the possibility of selling six to seven kilograms of cocaine on a weekly basis in the future; (3) statements by one of Garcia's colleagues that he had once had to kill an individual because of a problem in a drug transaction and would kill Turner or his partner if he discovered they were law enforcement officers; (4) the fact that Garcia and his co-conspirators stood to make over $14 million in drug sales annually with Officer Turner alone in the city of Chicago; (5) Garcia's lack of ties to the city of Chicago or state of Illinois; (6) the fact that Garcia lived and worked in Miami, Florida; (7) the fact that members of Garcia's family lived in Colombia and Garcia made frequent trips to Colombia; and (8) the fact that Garcia was building a house in Colombia. These factors when considered in the context of the total bond risk situation establish that the circuit court did not set constitutionally excessive bail in setting the bail bond at $607,000, since the record is replete with salient factors that clearly demonstrate that Garcia was a likely candidate to flee: he was charged with serious drug offenses, faced a possible prison sentence of thirty years, and was now known to be trafficking narcotics on a large scale not only in the city of Chicago, but also in New York and Miami. Thus, Garcia's rights under the Eighth and Fourteenth Amendments were not violated.

We have previously stated that "While we may not necessarily agree with the amount of bail set, we will not overrule the state trial court's determination as to the amount of bail unless its decision was made in an arbitrary manner." *United States ex rel. Fitzgerald v. Jordan,* 747 F.2d 1120, 1134 (7th Cir.1984). In *United States v. Zylstra,* 713 F.2d 1332 (7th Cir.1983), we refused to hold that a federal trial court

judge abused his discretion in setting bail at $1,000,000 or reinstating it on the third day of trial. The defendant in *Zylstra* was involved in a large drug conspiracy in which over 200,000 pounds of marijuana were smuggled into the United States over a three year period. In the instant case, testimony was offered at the bail hearings that Garcia was a member of a violent drug conspiracy that was operating in several major United States cities (New York, Chicago, and Miami) and was anticipating being able to sell six to seven kilograms of cocaine each week to Officer Turner and thus make over $14 million in sales to Officer Turner alone in Chicago. We have previously noted in this opinion, and many times previously, the nation's extreme concern, including the responsibility of the courts, with the increasing problem of drug trafficking and its devastating and pervasive effect on this country, especially its young.

It is neither our place, nor a federal district judge's prerogative to second guess a state court's bail decision when the record demonstrates the absence of a constitutional violation. Despite abundant testimony that Garcia was a likely candidate to flee, and thus required a bail at least equal to the amount as the one set by the state trial judge, the federal trial court found the bail figure to be "certainly arbitrarily excessive" stating:

> "With all relevant evidence before the state court, and with the proper considerations being applied, it is perhaps conceivable that $607,000 in bail might be called for—though *on the record* before Judge Kowalski that amount was certainly arbitrarily excessive, and that record does not suggest any real likelihood that further inquiry would show that figure to be proper."

*Garcia v. Elrod,* 643 F.Supp. 922, 925 (N.D.Ill.1986) (emphasis added). The federal judge also intimates that Garcia was no longer a candidate to flee:

> "And of course the *legitimate* constitutional considerations for setting bond—essentially to assure the defendant's appearance in court when required and to

assure the safety of other persons and the community—are not at all arithmetically proportionate to the amount involved in the drug transaction (at least where, as in this case, the defendant no longer has either the drugs or their value as a potential means and incentive for flight)."

*Id.* at 924–25 (emphasis in original). We disagree with the district court's belief that Garcia was no longer a candidate to flee. The record establishes that (1) he had been charged with offenses that called for a possible thirty years of imprisonment if convicted; (2) he was a member of a violent drug conspiracy that was now known to be operating in Chicago, New York, and Miami (where one of Garcia's co-conspirators had professed to killing someone in a drug transaction); (3) he was a hit and run operator who would poison the community with the sale of illegal drugs and run; (4) the conspiracy anticipated being able to provide six to seven kilograms of cocaine per week to Officer Turner (which would bring them almost $300,000 per week from sales to Officer Turner alone), and stood to make over $14 million each year in Chicago from sales to Turner alone; (5) Garcia had no contacts with either the state of Illinois or the city of Chicago; and (6) he had numerous connections with Colombia. In *Zylstra, supra,* the trial judge was justified in reinstating the defendant's bail bond of $1,000,000 since the wealth of evidence against the defendant gave him more than just an incentive to flee. For the reasons outlined above, the record clearly establishes that Garcia's participation in a large drug conspiracy gave him more than just an incentive to flee.

We fail to understand why the district judge in his memorandum opinion states that "Garcia [does not] challenge the constitutionality of the recently enacted Illinois Bail Act," 643 F.Supp. at 923, yet takes it upon himself to make a gratuitous finding that "There is no constitutional infirmity in the Act—only in its erroneous application here." *Id.* at 925. We hold the state court judge did not set bail in a constitutionally excessive manner in setting bail at $607,000 since the record gives more than ample support to his decision.

In holding as we do, we are mindful of what Mr. Justice Holmes stated in *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929): "[t]here is no canon against using common sense in construing laws as saying what they obviously mean." We hold that considering the ample record made before the Illinois state circuit court (87 pages of testimony) that its discretionary bail decision was neither "arbitrarily excessive" nor identical to the amount of the drugs' street value as alleged by the habeas corpus judge. We hold the federal judge's grant of Garcia's habeas corpus petition was "an unwarranted interference in the operation of the state's criminal justice system." A federal court should neither substitute its opinion as to what an appropriate amount of bail should be nor decide what factor should be given the greatest weight, in the absence of a constitutional violation. The decision of the district court granting Garcia a writ of habeas corpus is reversed.

EASTERBROOK, Circuit Judge, concurring.

I join the court's opinion, which analyzes the record and persuasively shows that the state court did not act "arbitrarily" in setting Garcia's bond at $607,000. The court answers the only question the sheriff put to us. Yet it should not pass unnoticed that the sheriff asked the wrong question.

Judge Kowalski of the Circuit Court of Cook County decided what bail to set. The appellate court affirmed. The Supreme Court of Illinois reviewed the case and affirmed in turn. The district court proceeded as if it had under consideration a direct appeal from the decision of the Supreme Court of Illinois. And now we have the direct appeal from the district court—making us the fifth court (and the thirteenth, fourteenth, and fifteenth judges) to ask whether $607,000 is the right amount of bail.

In exercising an "appellate" jurisdiction over the Supreme Court of Illinois, the district court asked whether Judge Kowalski had misunderstood—or, if he under-

stood, misapplied—the bail statute of Illinois. See Ill.Rev.Stat. ch. 38 ¶ 110–5(b)(4), which states: "When a person is charged with a drug related offense ... the full street value of the drugs seized shall be considered." The district court expressly found that the circuit court, and presumably the Supreme Court of Illinois, had erred in the application of Illinois law. As the district court put it, the state judges acted "on the mistaken assumption the Illinois General Assembly has equated street value with reasonable bail. It has not. There is no unconstitutional infirmity in the Act—only in its erroneous application here." *Garcia v. Elrod*, 643 F.Supp. 922, 925 (N.D.Ill.1986) (footnote omitted). As the sheriff has briefed the case, we are to decide who correctly understood Illinois law, the state courts or the federal district judge.

Yet a federal court may not disagree with the state courts' construction of state law. *Herb v. Pitcairn*, 324 U.S. 117, 125–26, 65 S.Ct. 459, 463–64, 89 L.Ed. 789 (1945). State law means what state judges say it means, just as federal law means (for the purposes of judges of inferior federal courts) what the Supreme Court of the United States concludes it means. If eleven state judges, including a unanimous Supreme Court of Illinois, say that $607,000 is the right bail, they have defined the meaning of state law. The decision of the Supreme Court of Illinois on a question of state law cannot be "mistaken" for the purposes of a federal court. It may be mistaken in the sense that the state judges later will reverse themselves, or the legislature will declare that the judges have not grasped the purport of the law; but it is not mistaken in the sense that a federal court may set aside the judgment. So far as the federal courts are concerned, the circuit court adhered scrupulously to the law of Illinois. We must ask not whether Judge Kowalski obeyed state law, but whether his decision violated the eighth amendment to the Constitution.

A federal court may encounter a genuine error of state law when an appellate court within a state declares that the trial court made a mistake. Then it may be necessary to ask whether the error of state law violated the Constitution. Even so, an error is not itself a violation of the Constitution. It is not enough to issue the writ of habeas corpus, as the district court did. The statute governing writs of habeas corpus provides that a federal judge may release a state's prisoner only if the custody is "in violation of the Constitution or laws or treaties of the United States". 28 U.S.C. § 2241(c)(3). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). See also *Engle v. Isaac*, 456 U.S. 107, 119–21 & n. 21, 102 S.Ct. 1558, 1567–68 & n. 21, 71 L.Ed.2d 783 (1982). Cf. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

The eighth amendment potentially makes errors of state law pertinent through the definition of "excessive" bail. That language comes from the Bill of Rights of 1689, 1 Wm. & Mary, 2d Sess., ch. II, § I(10). See 4 William Blackstone, *Commentaries on the Law of England* *294–96 (1769). It grew out of struggles between Parliament and the Crown, and a principal function of the provisions from which it was derived was to prevent the King's judges from abrogating the distinction between bailable and nonbailable (capital) offenses. See *United States v. Edwards*, 430 A.2d 1321 (D.C.1981) (en banc), which contains a thorough and thoughtful discussion of the background of the bail clause of the eighth amendment. We took the language wholesale, and "when this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept." *Carlson v. Landon*, 342 U.S. 524, 545, 72 S.Ct. 525, 536–37, 96 L.Ed. 547 (1952) (footnote omitted). When the legislature wants bail to be available for those arrested, the judiciary may not countermand the decision by imposing "excessive" bail. When the legislature makes an offense non-bailable, or allows the imposition of high bail, the judicial branch may

implement the decision without violating the Constitution.

The application of this rule to the implementation of statutes of the United States by federal courts makes perfect sense, for it carries out the original meaning of the language, the one we inherited from England. It is harder to apply the rule to state courts, because it assumes a separation of functions between legislature and judiciary that states need not employ. So far as federal courts are concerned, states may apportion governmental powers largely as they please. See *City of Newport v. Iacobucci,* ── U.S. ──, 107 S.Ct. 383, 385–86, 93 L.Ed.2d 334 (1986); *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Huggins v. Isenbarger,* 798 F.2d 203, 207–08 (7th Cir.1986) (concurring opinion); *United Beverage Co. of South Bend v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155 (7th Cir.1985). It is therefore doubtful that the eighth amendment, if "incorporated" and applied to states through the fourteenth, properly serves the separation-of-powers function it has when applied to cases in the federal courts. The Supreme Court has never hinted that the bail clause controls the allocation of powers within states—indeed, the Court has never held that it applies to the states. (This is still another question the sheriff did not present for decision.) Because of the differences in the allocation of functions, if the bail clause applies to the states at all, "errors" of state law by state courts are to be corrected by such processes (judicial and political) as the state makes available.

From time to time opinions of this court have put the question for decision as whether a state judge acted "arbitrarily" in setting bail. E.g., *United States ex rel. Fitzgerald v. Jordan,* 747 F.2d 1120, 1133 (7th Cir.1984). This may be taken as an invitation to review the record and measure the evidence against the standards of state law, as the district judge did. The constitutional question, though, is whether bail is "excessive" within the meaning of the eighth amendment. The purpose of the language in *Fitzgerald* is not to set the district judge as an appellate tribunal over the supreme court of the state; it is a warning that the district court cannot and should not review the record in every case to make a *de novo* judgment of the "excessiveness" of the bail. Only if the choice is "arbitrary"—that is, only if it is way off the mark to conclude that a certain amount of bond is within the constitutional standard—may a federal court issue the writ. The search for "arbitrariness", in other words, is designed to reduce the scope of federal review. This is how the court reads *Fitzgerald* today. The inquiry is like the one *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979), employs to decide when evidence is constitutionally insufficient to support a conviction. We should ask: Could any reasonable judge believe that $607,000 was a constitutionally permissible bond for Garcia? If the bond is within the substantial range that a reasonable person could conclude falls short of "excessiveness", the district court must decline to issue the writ.

The court does not pursue the lines of inquiry I have suggested, because the state did not ask us to. The sheriff wanted us to determine who was right, Judge Kowalski or Judge Shadur. The court properly confines the inquiry to questions preserved in the district court. The state has received the right answer to the question before us. I trust that this will not prevent the question from being recast in a future case.