**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mauricio BORRERO–ISAZA,
Defendant–Appellant.**

**No. 87–5194.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 1, 1988.
Decided Oct. 19, 1989.

Mary F. Gibbons, Beverly Hills, Cal., for defendant-appellant.

John F. Walsh, III, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before HALL and LEAVY, Circuit Judges, and STRAND *, District Judge.

* The Honorable Roger G. Strand, United States District Judge, District of Arizona, sitting by designation.

PER CURIAM:

## I.

Defendant–Appellant, Mauricio Borrero–Isaza, appeals from a judgment and commitment order filed on June 25, 1987, which adjudged defendant guilty of one count of violation of 21 U.S.C. § 846 (1982) (conspiracy to distribute and to possess with intent to distribute cocaine) and two counts of violation of 21 U.S.C. § 841(a)(1) (1982) (possession with intent to distribute cocaine). Appellant received a sentence of twelve years in the custody of the Attorney General along with a five year post-release probation period on the conspiracy count, and he received consecutive twenty year suspended sentences on the other two counts.

## II.

On January 9, 1986, appellant Borrero was arrested at codefendant Thomas Lind's place of business, "Hawaiian Shaved Ice," after Drug Enforcement Administration agents found approximately one kilogram of cocaine in appellant's car. Codefendant Lind was also arrested that same day for possession of one kilogram of cocaine.

On January 18, 1986, a three-count indictment was filed in the United States District Court for the Central District of California against both Borrero and co-defendant Lind. Borrero pled not guilty to all counts. On February 14, 1986, a superceding indictment was filed, and appellant again pled not guilty to all counts.

Co-defendant Lind pled guilty to counts I and II of the superceding indictment on March 24, 1986. On May 5, 1986, Lind was sentenced and committed to the custody of the Attorney General for seven years to be followed by a five year probationary period on count I (conspiracy) and a twenty year, suspended sentence on count II (possession with intent to distribute cocaine).

Appellant Borrero's trial began on April 2, 1986 and concluded with guilty verdicts on counts I, II and IV (conspiracy and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1)) and with not guilty verdicts on Counts III and V (possession with intent to distribute methaqualone).

On June 6, 1986, appellant was sentenced and committed to the custody of the Attorney General for a period of twelve years followed by a five year period of probation on count I of the indictment and consecutive twenty year suspended sentences were imposed with respect to counts II and IV of the indictment. Borrero appealed several of the district court's orders, including the order of judgment and commitment. On April 15, 1987, 815 F.2d 1493, the Ninth Circuit remanded the case for resentencing because the district court had not specifically given the appellant an opportunity to object to the presentence report, in compliance with Fed.R.Crim.P. 32(a)(1).

On June 22, 1987, a hearing was held on appellant's motion to correct the presentence report. The court granted the motion and corrected the presentence report by deleting the term "source" and replacing it with the word "delivered" making it clear that the appellant had delivered the cocaine, but was not the source of the cocaine. (6/22/87 Transcript at 7). The same day, the trial judge resentenced Borrero to the identical terms as were originally ordered, twelve years in the custody of the Attorney General with parole eligibility pursuant to 18 U.S.C. § 4205(b)(2) (1982) followed by a five year term of probation on count I, and consecutive twenty year suspended sentences on each of the other two counts.

## III.

At both sentencing hearings, the judge enhanced Borrero's sentence because Borrero came from a "source country." The question arises whether this was a proper basis for imposing a harsher sentence. On appeal, Borrero contends that the district court violated his right to due process. He argues that he is a member of an identifiable group (Colombians), that there was a substantial degree of differential treatment between himself and his co-defendant (a five year sentencing difference), and that the disparity was not neu-

tral with respect to national origin. *Cf. Batson v. Kentucky,* 476 U.S. 79, 93–95, 106 S.Ct. 1712, 1721–22, 90 L.Ed.2d 69 (1986) (outlining the factors that establish a prima facie case of purposeful discrimination in the selection of the venire). Appellant asserts that the disparate treatment based solely on national origin is unconstitutional because "racial and ethnic distinctions of any sort are inherently suspect." *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978); *see also Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.").

The government agrees that a sentencing court cannot impose a more severe sentence on the sole basis of a defendant's alienage or nationality, stating: "Any other rule would be as morally repugnant as it would be unconstitutional." Brief of Appellee 11. Instead, the government objects to Borrero's characterization of the events at sentencing. According to the government, the sentencing judge imposed a harsher sentence because of Borrero's "extensive ties to a narcotics source country," and not because of his national origin. *Id.*

### A.

Trial judges are accorded virtually unfettered discretion in determining what sentence to impose on a defendant. *United States v. Barker,* 771 F.2d 1362, 1364 (9th Cir.1985) (citing *Dorszynski v. United States,* 418 U.S. 424, 437, 94 S.Ct. 3042, 3049, 41 L.Ed.2d 855 (1974)); *United States v. Stewart,* 820 F.2d 1107, 1108 (9th Cir.), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). This discretion enables the sentencing judge to consider a wide, largely unlimited variety of information to insure that the punishment fits not only the crime, but the individual defendant as well.

*United States v. Safirstein,* 827 F.2d 1380, 1384–85 (9th Cir.1987) (citing, *inter alia,* 18 U.S.C. § 3577[1]).

While a federal sentence within statutory limits ordinarily is not subject to review, the constitutional guarantee of due process, which continues to operate through sentencing, *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), circumscribes the district court's discretion. *See United States v. Gomez,* 797 F.2d 417, 419 (7th Cir.1986) (sentencing defendant more harshly because of his nationality "obviously would be unconstitutional"); *see also United States v. Tucker,* 404 U.S. 443, 446–47, 92 S.Ct. 589, 591–92, 30 L.Ed.2d 592 (1972); *Safirstein,* 827 F.2d at 1384–85; *United States v. Salas,* 824 F.2d 751, 752 (9th Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). Thus, the district judge may not consider improper, inaccurate, or mistaken information, nor may he make unfounded assumptions or groundless inferences in imposing sentence. *Safirstein,* 827 F.2d at 1385 (abuse of discretion to impose maximum sentence based upon groundless inference of involvement in drug trafficking); *see also Dorszynski,* 418 U.S. at 431 n. 7, 94 S.Ct. at 3047 n. 7 (sentence may not be based upon improper or inaccurate information); *Tucker,* 404 U.S. at 447, 92 S.Ct. at 591 (review available if district judge relied upon "misinformation of constitutional magnitude"); *United States v. Weston,* 448 F.2d 626, 634 (9th Cir.1971) (unconstitutional to rely upon information that is materially untrue or of little value because lacking in indicia of reliability).

### B.

Whether Borrero's right to due process was violated hinges upon the district court's actual basis for imposing a stricter sentence. There are two possibilities: Borrero received an enhanced sentence either (1) because of his national origin or (2) because he obtained the drugs from a

---

**1.** Section 3577 provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person con-

victed of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

source country. Our resolution of this issue begins and ends with a review of the record.

### 1.

At the sentencing hearing on June 6, the court outlined its reasoning for imposing Borrero's sentence:

Number one, I think your client [Borrero] committed perjury.[2]

Number two, I think he was the source as compared with Mr. Lind.

Number three, he comes from a country of origin, namely, Colombia, which is a country that supplies much of the narcotics to this country.

Number four, [they] are the total scourge of this country right now, and I am not going to tolerate it, and I want the message to go to Colombia that we are not going to accept this kind of thing. All right.

Number five, that he doesn't use narcotics, and therefore, was doing this strictly for the money.

And number six, that Mr. Lind was sentenced to seven years, and I consider him [Borrero] more culpable.

(6/6/86 Transcript at 862).

This recitation sparked a long colloquy between the court and defense counsel. Defense counsel attempted to articulate that Borrero was not a major drug player: "We are not talking about a guy that is the head of an international organization." The court interrupted:

I don't think you are talking about the man and international organizations. All right. i.e., Colombia/United States access. Okay. But I want the guy, as you put it, who is down there in Colombia, that if somebody like this gets the sentence that he is going to get, wait until the man down there is caught. He is going to get buried. I want him to know that.

Defense counsel insisted that Borrero was not a "heavy weight." The court did not directly respond to this point; instead, it asked counsel:

How in the world [does] somebody coming from Colombia, as he does, come to this country and traffic, as I believe, in narcotics unless his perception coming from Colombia was, "Boy, you go to the United States, and you are not looking at much of a problem"?

Defense counsel then argued that it would be inequitable to sentence Borrero disproportionately to others committing the same crime just to "send a message" to Colombia. Unmoved, the court distinguished this case, noting (among other things): "So, your argument that you have to give consideration to what is done elsewhere, I will give consideration to it. But I am telling you that the kind of sentence you are looking at don't involve foreigners from countries of origin like this, number one." The court continued:

[T]he average sentences that are received regarding a number of people, number one, who are not from foreign countries.

Number two, they are not dealing in a purity and quantity this man was dealing in.

Number three, they were not from a country of origin.

And number four, they didn't go to trial to perjure themselves ...

So, can I distinguish this case from the run-of-mill? Yes, easily.

Apparently disturbed by these remarks, defense counsel responded: "I don't think that, if your saying, that somehow we should sentence foreigners to more time, I ...." The court quickly interrupted, and the following exchange ensued:

Court: You know, that is such a gross distortion of what I just said.

Counsel: You said, one, he is a foreigner.

Court: I did not. I said if the country of origin where you have a country of origin that is a significant source of cocaine.

---

2. The court conceded that both Borrero and Lind had lied, but believed Lind's lying was "less egregious" because he perjured himself at sentencing, whereas Borrero committed perjury at trial.

Counsel: But I believe your original thinking was, one, he was not from this country. He was a foreigner and that distinguishes him.

Court: If I said that ... it was short of the mark. What I intended to say, if I didn't what I just said, the country of origin and the fact that he comes here as a foreigner. I mean, would you possibly, as an American, think of going down to Colombia and deal in narcotics? You have to be kidding.

You know what he thinks is he can come into this country and do it because the people aren't enforcing the laws in this country. I want him to know that people are enforcing the laws.

Before imposing sentence, the court stated:

And I have nothing against the country of Colombia. I want to make that clear. And as a group, I am sure they are fine people. The fact of the matter is it happens to be [a] cadre of people in that country that seem to deal in narcotics. That is a matter of public knowledge.

At the second sentencing hearing, on June 22, 1987, the topic of an enhanced sentence once again emerged. Initially, defense counsel objected to the presentence report's reference to Borrero as the source of the cocaine. The government stipulated that it had "no evidence to indicate that [Borrero] actually flew from Colombia and brought over two kilograms of cocaine." Defense counsel suggested that the phrase "Mr. Borrero delivered the quantity involved" be inserted in lieu of the term "source." The court agreed, stating his belief that this was an "accurate characterization."

The court and the parties then turned their attention to the twelve-year sentence. By way of introduction, the court informed defense counsel:

I just finished a case with two Colombian aliens. Not only aliens. Illegal aliens. They come to this country, and do you know what their view of this country is? Not only that. They don't even speak the language. They come here and sell large quantities of cocaine.

They were convicted, and they are going to go away for a large period of time ... The message has to be there for those people who would profit from this. They are going to pay a dear price if they are caught ...

The court then emphasized the need for deterrence, which it believed would be served by harsher sentences:

[P]eople, such as Mr. Borrero are emboldened to undertake this type of crime because they don't think they are going to pay for it that much, if they are caught, number one. They don't necessarily believe they are going to get caught. If they are caught, some of these lax sentences that are meted out, if you will, cause people of Mr. Borrero's ilk to feel that they can do this. It has gone so far ... that an illegal alien who doesn't speak the language from Colombia—two of them just sitting at that table right there last week, come here, and with impunity ... sell kilogram quantities of cocaine ...

.    .    .    .    .

I am not pounding my judicial chest. I am just telling you that something has got to be done about it.

.    .    .    .    .

And somehow the people who are selling narcotics, particularly from source countries have to know that we in the United States mean business, and we are going to put a stop to this.

Defense counsel then turned the discussion to the sentencing disparity between Borrero, who received twelve years, and his codefendant, who received seven years. Counsel candidly expressed her "trouble[ ]" that the codefendant's being "Anglo" accounted for the disparity. The court curtly replied: "Anglo has absolutely nothing to do with it." But counsel explained that the court's sentence created an appearance of two systems of justice in this country for those who distribute narcotics: one for "Anglos," another for Colombians. The court disagreed:

My perception was [Borrero's codefendant] was not as involved ... as Mr.

Borrero ... And, importantly, he was not from a source country, and I want people in Colombia to know it is not going to be tolerated.

The court reinstated the twelve-year sentence.

### 2.

After a careful review of the record, we are left with the overriding impression that the district court partially based the sentence on Borrero's national origin. Apparently, the district court believed that the best way to "send a message" to source countries was to penalize people with national ties to those countries.

The government lists several facts that emerged at trial to support its contention that Borrero's sentence was influenced by his extensive drug ties, rather than his national ties, to Colombia. For example, the government notes that prior to Lind's arrest he referred to Borrero's as "an old drug connection from South America" and as the "source." Further, Borrero had made frequent trips from Colombia to Miami in the years prior to Lind's statement and had admitted to a drug problem while living in Colombia.

We need not decide whether the record would sufficiently support an inference that Borrero had been trafficking in Colombian narcotics. This question would be relevant only if the district court actually made such an inference. The tenor and content of the record as a whole simply provide no support for so concluding. For example, on numerous occasions the district court stated that the enhancement was attributable to the fact that "*he* [Borrero] comes from a country of origin." (emphasis added). Notably, the district court said that Borrero, not the drugs, came from a source country. It is also notable that the district court judge never indicated that he believed the drugs were tied to Colombian drug trafficking, although defense counsel suggested that the court impermissibly imposed a harsher sentence because Borrero was Colombian. In fact, the court's response to this suggestion only adds to the appearance of impropriety. The court countered: "What I intended to say ... the country of origin *and the fact that he comes here as a foreigner.* I mean, would you possibly, as an American, think of going down to Colombia and deal in narcotics? You have to be kidding." (emphasis added). The conclusion is unavoidable: Borrero was penalized because of his national origin, and not because he trafficked in drugs that emanated from a source country.

### 3.

It bears emphasis that our conclusion depends entirely on our reading of the particular record before us. This case, therefore, can be distinguished from the Seventh Circuit decision in *United States v. Gomez*, 797 F.2d 417 (7th Cir.1986). *See also United States v. Malik*, 680 F.2d 1162 (7th Cir.1982) (permissible to send message to others involved in defendants' heroin organization, which trafficked in drugs from Mideast). In *Gomez*, an illegal alien pleaded guilty to a charge of conspiracy to distribute a controlled substance. Upon imposing sentence, the district court took note that Gomez was an illegal alien who "entered into this in a deliberate, calculated, intentional involvement in one of the most despicable businesses we have in our society [and who], unlike most aliens, ... did not come to this country fleeing poverty ... [or] any governmental suppression." *Id.* at 419 n. 3. The court sentenced Gomez to fifteen years imprisonment, intending the sentence to "serve as a deterrent to others." *Id.*

On appeal, the Seventh Circuit reviewed "the impact which [Gomez'] *illegal alien status* may have had on the sentence imposed," *id.* at 418 (emphasis added), and concluded that the sentencing judge had not abused his discretion. The appellate court accorded great weight to the nexus between Gomez' illegal entry into this country and his entrance into the illicit drug business. It reasoned: "The nationality of Gomez, and his illegal entry and entrance into the illicit drug business, are too related to be artificially separated for sentencing purposes." *Id.* at 420. The court then observed that "[t]he flow of

drugs from certain Latin countries along with the flow of people from those countries constitutes a part of the narcotics problem to be dealt with ..." *Id.* at 420–21.

. . . . .

We understand the Seventh Circuit's holding to be predicated on the belief that the sentencing judge considered Gomez to have been trafficking in Colombian drugs. The court noted that the "[sentencing] judge expressed [both] concern ... about the increasing number of people from Latin countries *bringing illegal drugs into the district* ... and hope that the sentence would serve as a deterrent to others who might contemplate following in the footsteps of Gomez." *Id.* at 420 (emphasis added). Indeed, Gomez argued on appeal that the sentencing judge intimated, without record support, that he illegally had entered this country from Colombia deliberately to distribute narcotics. Although the appellate court conceded that the record did not explicitly establish this point, it nonetheless concluded that "it could easily be inferred." *Id.* at 421.

In the course of its discussion, the Seventh Circuit remarked that the Constitution did not command the sentencing court "to ignore the identity of the countries which are recognized as often the source of the narcotics problems of this country and from which drug traffickers immigrate to this country." *Id.* at 420. The court then noted that "the [sentencing] court's concern was not ethnic, but geographic, geographic because Colombia has the reputation of being narcotically troublesome." *Id.*

We do not read the holding in *Gomez* to be based merely on a facile distinction between ethnicity and geography. To do so would be to extricate the holding from its facts and to rest on a precarious constitutional foundation. *See Bakke,* 438 U.S. at

291, 98 S.Ct. at 2748 ("[E]thnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial scrutiny."). It would be far too easy to veil ethnic bias in sentencing (whether advertently or inadvertently) by focusing instead on the defendant's geographical ties. *See also United States ex rel. Garcia v. O'Grady,* 812 F.2d 347, 353, n. 8 (7th Cir. 1987).

■ Of course, this does not mean that sentencing courts must turn a blind eye to geographical troublespots when dealing with criminals who participate in the international drug business. American jurisprudence long has recognized that one objective of sentencing is to prevent similar misconduct of others, *see Barker,* 771 F.2d at 1368, and our circuit has sanctioned the implementation of this aim, when effectuated judiciously and with due deliberation. *Id.* It would be appropriate, therefore, for a sentencing court to consider the fact that a criminal has trafficked in drugs originating from a source country, like Colombia. The court properly may reach this conclusion, and should so state,[3] by drawing reasonable inferences supported by the record. *See Safirstein,* 827 F.2d at 1387 (recognizing a litany of Ninth Circuit decisions that have permitted the drawing of reasonable inferences at sentencing). However, the Constitution demands that the focus be on the *source of the drug trafficking.* With this focus, the individual's national origin truly is irrelevant. An American dealing in Colombian drugs would be no less susceptible to an enhanced sentence than would be a Colombian. Understood in this way, and only in this way, we embrace the ethnicity/geography distinction made by our sister circuit.[4]

### IV.

■ Finally, appellant seeks to have any resentencing performed by a different

---

3. In this area of constitutional sensitivity, we believe it to be the better practice for the sentencing court to explicitly state the precise factual support in the record to conclude that the convicted defendant has trafficked in narcotics from a source country. If the particular drugs in question cannot be linked directly to a source country, the sentencing court should explain the foundation for its belief that the defendant has

participated in narcotics distribution from a source country.

4. We do not believe that the Seventh Circuit intended anything more by this distinction. We doubt, for example, that the Seventh Circuit would tolerate an enhanced sentence given to a first-time defendant who came to the United States legally from Colombia fifteen years ago,

judge. He argues that remand to a different judge is necessary in order "to preserve the appearance of justice." Absent "unusual circumstances," however, resentencing is to be done by the original sentencing judge. *United States v. Alverson,* 666 F.2d 341, 349 (9th Cir.1982). This court has articulated several factors to be considered in deciding whether resentencing should be conducted by a different judge. They include: (1) the difficulties, if any, that the district court would have at being objective upon remand because of prior information received; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication of effort out of proportion to any gain in preserving the appearance of justice. *Id.* at 349.

▪ We find that there is no need to remand this case to a different judge for resentencing. The fact that a judge has strong feelings on a particular crime does not automatically disqualify him from sentencing those who have committed that crime. There is nothing in the record to indicate that the trial judge would be other than objective, fair and impartial if called upon to resentence the appellant in this case. Furthermore, in order for another court to sentence Borrero, it would have to review the voluminous pleadings and testimony in this case and make its own factual findings. This would entail substantial waste and duplication of effort out of proportion to any gain in preserving the appearance of justice. We therefore vacate the sentence and remand the matter to the trial judge for resentencing consistent with this opinion.

VACATED AND REMANDED.

where there is no evidence of Colombian drug ties.

Of course, the facts in this case are not so attenuated. Nevertheless, we have concluded,

*supra,* that the district court did not make an inference that the drugs in question came from Colombia.